**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TEYO JOHNSON,

                Plaintiff,

        v.

EVERYREALM INC., COMPOUND ASSET
MANAGEMENT LLC, REALM METAVERSE REAL
ESTATE INC., REPUBLIC, REPUBLIC CRYPTO
LLC, REPUBLIC REALM MANAGER LLC,
REPUBLIC REALM INC., REPUBLIC
OPERATIONS LLC, OPENDEAL INC., OPENDEAL
PORTAL LLC, JULIA SCHWARTZ in her individual
and professional capacities, and JANINE YORIO in her
individual and professional capacities,

                Defendants.

Index No.: 1:22-cv-06669

**COMPLAINT**

**Jury Trial Demanded**

Plaintiff Teyo Johnson, by his counsel, Seppinni LLP, alleges based on information and belief, at all relevant times, as follows:

**PRELIMINARY STATEMENT**

1.    Defendants used their positions of power to sexually harass, discriminate against, and retaliate against former Everyrealm[1] employee Teyo Johnson.

2.    These allegations include, among others:

- The use of despicable slurs by Ms. Yorio against Mr. Johnson and others, some of which are detailed herein (including "the whitest Black person," "stupid Black person," "dick," and "fucking dick;"

---

[1] "Everyrealm" includes reference to Everyrealm Inc., Compound Asset Management LLC, Realm Metaverse Real Estate Inc., Republic, Republic Realm Manager LLC, Republic Crypto LLC, Republic Operations LLC, Opendeal Inc., Opendeal Portal LLC, and Republic Realm Inc., where relevant herein.

- Racist jokes made by Defendants at Mr. Johnson's expense—including comments by Ms. Yorio threatening to "trade" him if he did not perform and other comments implying that Ms. Yorio owned Mr. Johnson; and

- Retaliation after Mr. Johnson reported that a proposed crypto gambling business initiative would violate multiple laws.

3.     Everyrealm is a digital real estate company that invests in and develops virtual worlds.[2]

4.     Defendants parlayed media attention around the opaque sale of the company's so-called Metaflower Super Mega Yacht[3, 4, 5] into a roughly $60,000,000 Series A investment round valuing Everyrealm at over $200,000,000. Blue-chip investors participated including Andreessen Horowitz (led by Arianna Simpson[6]), Lightspeed Venture Partners, Coinbase Ventures, Dapper Labs, NGC Ventures, Dragonfly Capital, Liberty City Ventures, and Hash, among others.[7]

---

[2] Crunchbase, Everyrealm Financials, https://www.crunchbase.com/organization/Everyrealm (last visited on

[3] Tony Ho Tran, Futurism, *Someone Paid $650,000 for a Nonexistent Yacht in the Metaverse: The Yacht is Comically Hideous, and can only be Described as "Minecraft-Esque" with its Block Design*, https://futurism.com/the-byte/650000-nft-yacht-metaverse (last visited Jul 31, 2022).

[4] Archyde, Technology News, *Would You Buy a Virtual Yacht for 650 thousand dollars on the Internet?*, https://www.archyde.com/would-you-buy-a-virtual-yacht-for-650-thousand-dollars-on-the-internet-technology-news-technology/ (last visited Jul. 31, 2022).

[5] Daily Telegraph NZ, Tech, *Virtual Megayacht Sold for $650k: A Yacht Featuring two Helipads, a hot tub, and a DJ Booth has been Sold for a Whopping $650,000 in the Sandbox Virtual Gaming World.* ***The Identity of the Metaflower Super Mega Yacht's Buyer is Unknown***, https://dailytelegraph.co.nz/tech/virtual-mega-yacht-sold-for-650k/ (emphasis added) (last visited Jul. 31, 2022).

[6] Anita Ramaswamy, *Republic's Metaverse Real Estate Arm Spins off, Rebrands as Everyrealm,* TechCrunch, https://techcrunch.com/2022/02/10/republics-metaverse-real-estate-arm-spins-off-rebrands-as-everyrealm/ (last visited Jul. 31, 2022)

[7] Crunchbase, Everyrealm Financials, https://www.crunchbase.com/organization/Everyrealm/school_financials ("Andreessen Horowitz's Arianna Simpson led the round as a new investor alongside a mix of new and old backers") (last visited Jul. 31, 2022).

5.    Everyrealm's parent company, Republic,[8, 9] owned a sizable portion of Everyrealm's equity prior to the Series A financing round.

6.    Republic used the Series A financing round to cash-out much of its equity ownership in its subsidiary but retains functional control over Everyrealm's day-to-day operations and its Board of Directors.[10] For example, Republic co-founder Andrew Durgee is Everyrealm's Managing Director and, upon information and belief, Chairman of Everyrealm's Board of Directors.[11]

7.    Everyrealm's list of celebrity and influencer investors hoping to cash-in on the company's promises is long and includes Will Smith (via Dreamers VC), The Weeknd, Nas, Post Malone (via Electric Feel Ventures), Lil Baby, Paris Hilton, Brie Larson, Gene Simmons, Gunna,

---

[8] Andrew Hayward, Decrypt, *Metaverse Land Investor Everyrealm Raises $60M Led by Andreessen*, https://...decrypt.co/92664/metaverse-everyrealm-raises-60m-andreessen ("…**parent company Republic**, which remains a minority investor[.]" (Emphasis added) (last visited Jul. 31, 2022).

[9] Anita Ramaswamy, *Republic's Metaverse Real Estate Arm Spins off, Rebrands as Everyrealm,* TechCrunch, https://techcrunch.com/2022/02/10/republics-metaverse-real-estate-arm-spins-off-rebrands-as-everyrealm/ ("**Republic** has been an active investor in metaverse real estate properties **through its Republic Realm division**, headed since June 2020 by Janine Yorio.") (Emphasis added) (last visited Jul. 31, 2022).

[10] SEC.gov, EDGAR, *Everyrealm/Realm Metaverse Real Estate Inc. Preliminary Offering Circular*, https://www.sec.gov/Archives/edgar/data/1854001/000149315222007846/partiiandiii.htm#a_009 at 32, 43 ("The Company has engaged Republic Realm Manager, LLC (the '*Manager*'), a Delaware limited liability company controlled by Everyrealm Inc. (an entity formed on September 28, 2021 under the name Republic Realm Inc., after the Company changed its name to Realm Metaverse Real Estate Inc., thus making its former name available, and renamed Everyrealm Inc. on February 3, 2022), to provide management services to the Company in accordance with a management agreement (the '*Management Agreement*'). Two individuals – Jesse Stein and Janine Yorio – who are agents of the Manager and Everyrealm Inc., serve, together with Andrew Durgee (all three, collectively, the "*Principals*"), as the executive officers of the Company and as the members of its board of directors. Under the Management Agreement, the Manager (i) assists in screening and evaluating business proposals and opportunities for the Company, (ii) assists as needed in respect of transactions under which the Company makes investments, (iii) monitors the holdings of the Company, and (iv) evaluates liquidity options and dispositions for assets held by the Company. The Manager is the sole owner of Class A Shares and, as of the date of this Offering Circular, has effective voting control of the Company. Republic Realm Inc. became the Manager's managing member and majority interest holder, when Compound Asset Management, LLC assigned and transferred, to Republic Realm Inc., Compound Asset Management, LLC's ownership interest and management responsibilities in the Manager. Everyrealm Inc. and Compound Asset Management, LLC are affiliated.") (Last visited Aug. 2, 2022).

[11] *Id.*

3

Baby Keem, Hannah Bronfman, Fara Leff, Ebonie Ward, Miye Oni, Belly, Pro Logic, Mark Pincus, Jeffrey Zirlin, Anthony Saleh, NAV, Randi Zuckerberg, Wassim "SAL" Slaiby, Amir "Cash" Esmailian, Nancy Ajram, Mario Götze, Marc Anthony, and Jeffrey Katzenberg.

8.    Andreessen Horowitz's Cultural Leadership Fund facilitated many of these celebrity and influencer investor introductions.[12]

9.    Defendants hired Plaintiff Teyo Johnson to manage these celebrity relationships and to develop new celebrity, sports, and brand partnerships for the company. Before Everyrealm terminated Mr. Johnson without notice he was a high performing Director there.

10.    Defendants brazenly and repeatedly discriminated against Mr. Johnson on account of his race, ethnicity, pattern of speech, and skin color.

11.    Since Mr. Johnson confidentially made Defendants' aware of much of the misconduct described herein, Everyrealm has threatened him with lawsuits, sanctions, and personal liability if he files this lawsuit, and has repeatedly demanded that he sit "individually" for a two-hour investigatory interview with Defendants' "independent" investigator.

12.    As a result of Defendants' unlawful conduct and the hostile work environment it created, Mr. Johnson asserts claims of discrimination under 42 U.S.C. § 1981 ("Section 1981"); discrimination, retaliation, and interference with his protected rights under the New York City Human Rights Laws ("NYCHRL"), N.Y.C. Admin. Code, §§ 8-107, et seq.; claims of discrimination, retaliation, and interference with his protected rights under the New York State Human Rights Laws ("NYSHRL"), pay discrimination under New York Labor Law § 194

---

[12] Retail Technology Innovation Hub, *Paris Hilton and Various Other Celebs Back Metaverse Startup Everyrealm,* https://retailtechinnovationhub.com/home/2022/3/23/paris-hilton-and-various-other-celebs-back-metaverse-startup-everyrealm#:~:text=The%20venture's%20latest%20investors%20include,%2C%20Pro%20Logic%2C%20and%20NAV (last visited Jul. 31, 2022).

("EPL"); claims of whistleblower retaliation under the New York Whistleblower Law N.Y. Labor Law § 740, et seq., and claims of common law Intentional Infliction of Emotional Distress.  Mr. Johnson seeks declaratory relief, monetary damages, attorneys' fees, and all other appropriate relief.

## THE PARTIES

13.     Plaintiff Teyo Johnson is a citizen of the State of Nevada, who is 40 years old at the time of this writing. At the times relevant herein he worked in New York, New York, the improper acts committed against him had their impact in New York, New York, and Mr. Johnson was assigned to Everyrealm's New York, New York office for at least two weeks per month. At all relevant times, Mr. Johnson met the definition of an "employee" and/or "eligible employee" under all applicable statutes. At all relevant times herein, Mr. Johnson was an employee of Defendant Everyrealm and/or Defendant Republic.

14.     Defendant Everyrealm Inc. is a so-called digital real estate company and a Delaware corporation with its principal place of business in New York, New York. Everyrealm is a subsidiary or affiliate of Republic. Upon information and belief, Everyrealm acts as a contractor and/or agent to various public companies, and it or its parent company is regulated by the Securities and Exchange Commission ("SEC").[13, 14] At all relevant times, Everyrealm met the definition of an "employer" or "covered employer" under all applicable statutes.

15.     Defendant Realm Metaverse Real Estate Inc. is a Delaware corporation with its principal place of business in New York, New York. It is a subsidiary or alter ego of Everyrealm

---

[13] SEC.gov, EDGAR, *Everyrealm/Realm Metaverse Real Estate Inc. Preliminary Offering Circular*, https://www.sec.gov/Archives/edgar/data/1854001/000149315222007846/partiiandiii.htm#a_009

[14] Republic.co, Disclaimer, https://republic.com/, ("a funding portal which is registered with the US Securities and Exchange Commission (SEC) as a funding portal (Portal) and is a member of the Financial Industry Regulatory Authority (FINRA)") (last visited Aug. 4, 2022).

Inc. and/or Republic. At all relevant times, Realm Metaverse Real Estate Inc. met the definition of an "employer" or "covered employer" under all applicable statutes.

16.     Defendant Compound Asset Management, LLC is a New York Limited Liability Corporation with its principal place of business in New York, New York. It is affiliated with and/or a subsidiary or alter ego of Everyrealm, Inc. and/or Republic. At all relevant times, Compound Asset Management, LLC met the definition of an "employer" or "covered employer" under all applicable statutes.

17.     Defendant Republic, an alternative asset crowdfunding company and a Delaware Corporation, is Everyrealm's parent company and/or, in the alternative, was Everyrealm's parent company at times relevant herein. Republic may be a trade name of Defendants Republic Operations LLC, Opendeal Inc., Opendeal Portal LLC, Republic Realm Manager LLC, and Republic Crypto LLC, *inter alia*. At all relevant times, Republic met the definition of an "employer" or "covered employer" under all applicable statutes. Any use of "Republic" in this complaint includes reference to Republic's Defendant subsidiaries and affiliates. Republic is regulated by the SEC.[15]

18.     Defendant Republic Realm Manager LLC is a Delaware Limited Liability Corporation that upon information and belief operates under the trade name Republic. At all relevant times, Republic Realm Manager LLC met the definition of an "employer" or "covered employer" under all applicable statutes.

19.     Defendant Republic Crypto LLC is a Delaware Limited Liability Corporation that upon information and belief operates under the trade name Republic. At all relevant times,

---

[15] Republic.co, Disclaimer, https://republic.com/, ("a funding portal which is registered with the US Securities and Exchange Commission (SEC) as a funding portal (Portal) and is a member of the Financial Industry Regulatory Authority (FINRA).") (last visited Aug. 4, 2022).

Republic Crypto LLC met the definition of an "employer" or "covered employer" under all applicable statutes.

20.     Defendant Republic Operations LLC is a Delaware Limited Liability Corporation that upon information and belief operates under the trade name Republic. At all relevant times, Republic Operations LLC met the definition of an "employer" or "covered employer" under all applicable statutes.

21.     Defendant Opendeal Inc. is a Delaware Corporation that upon information and belief operates under the trade name Republic. At all relevant times, Opendeal Inc. met the definition of an "employer" or "covered employer" under all applicable statutes.

22.     Defendant Opendeal Portal LLC is a Delaware Limited Liability Corporation that upon information and belief operates under the trade name Republic. At all relevant times, Opendeal Portal LLC met the definition of an "employer" or "covered employer" under all applicable statutes.

23.     Defendant Janine Yorio is a member of Everyrealm's Board of Directors and its CEO. At all relevant times, Ms. Yorio was employed by Everyrealm and/or Republic and met the definition of an "employer" or "covered employer" under all applicable statutes.

24.     Defendant Julia Schwartz is a member of Everyrealm's Board of Directors and an Everyrealm employee. At all relevant times, Ms. Schwartz was employed by Everyrealm and/or Republic and met the definition of an "employer" or "covered employer" under all applicable statutes.

## JURISDICTION AND VENUE

25.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under federal law.

26.     The Court has diversity jurisdiction over this action pursuant to 28 U.S.C § 1332, as there is diversity of citizenship between Plaintiff, a resident of the State of Nevada, and Defendants, who are either, upon information and belief, New York State residents and/or are headquartered in New York State, and this action involves a matter in controversy that exceeds $75,000, exclusive of interest and cost.

27.     This Court has supplemental subject matter jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

28.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district. Defendants' principal place of business is in this district.

## ADMINISTRATIVE PROCEDURES

29.     Following the commencement of this action, Plaintiff will file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff will file an Amended Complaint to include claims under Title VII upon receipt of a Notice of Right to Sue.

30.     Following the commencement of this action, Plaintiff may file an Administrative Complaint with the Occupational Safety and Health Administration ("OSHA") of the U.S. Department of Labor, alleging violations of the whistleblower provisions of the Sarbanes-Oxley Act. Plaintiff intends to file an Amended Complaint to include claims under the Sarbanes-Oxley

Act upon receipt of a letter from OSHA providing him with an administrative dismissal and withdrawal of the Administrative Complaint.

31.     Pursuant to NYCHRL § 8-502, Plaintiffs will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel within ten days of its filing, thereby satisfying the notice requirements of this action.

32.     Plaintiff has complied with any and all other prerequisites to filing this action.

## FACTUAL ALLEGATIONS

33.     Mr. Johnson is a shrewd and intelligent businessman. Prior to launching a career in private equity and commercial real estate he was a highly touted National Football League ("NFL") draft pick and completed a successful career in the NFL. Before joining the NFL, Mr. Johnson was a brilliant student at Stanford University and a two-sport athlete. This feat is unheard of in modern collegiate sports. There are some two-sport college athletes, but none who can claim to have been a starter on one of the best college basketball teams at the time for their "second" sport, Pac-10 Player of the Year in Football, and who successfully managed a full course load at a school as academically rigorous as Stanford University.

34.     Prior to Everyrealm, Mr. Johnson's career in corporate America picked up where his stellar athletic career left off. For example, Mr. Johnson facilitated the only known private equity investment by a person of color, James Harden, into Space X's private funding round that valued the company at $40 billion.

35.     Mr. Johnson also maintains an active business relationship with his former teammate and National Basketball Association legend, Yao Ming. Mr. Johnson consults as a sales

director for Mr. Ming's Yao Family Wines and recently negotiated a significant deal between MGM Resorts and Mr. Ming's company.

36.    Unfortunately, Ms. Yorio and other Defendants could not see past their prejudices when it came to Mr. Johnson and his role at Everyrealm.

**I.    Mr. Johnson Faces Race Discrimination and Sexual Harassment as a Job Applicant at Everyrealm**

37.    Before Mr. Johnson was invited to apply to work at Everyrealm he facilitated an introduction between a professional connection of his and Ms. Yorio that led to a $500,000 investment into Everyrealm's Series A round. Defendants were impressed by this, Mr. Johnson's professional network, his experience in commercial real estate, and his skills. Everyrealm subsequently interviewed Mr. Johnson and soon thereafter hired him to be the company's Director of Strategic Partnerships.

38.    In July 2022, Mr. Johnson learned that he was the victim of prejudice and racism at Everyrealm as early as the interview process.

39.    Everyrealm's former Human Resources ("HR") Director reports that during a candidate debrief following Mr. Johnson's interview with Ms. Yorio, Ms. Yorio stated, "Teyo is the whitest Black guy I've ever met."

40.    Everyrealm's HR Director responded, "Hey, we don't say that."

41.    Ms. Yorio doubled down: "No, I meant it in a good way."

42.    Everyrealm's HR Director told Ms. Yorio, "There is no good way."

43.    Just prior to this incident, during Mr. Johnson's interview, Mr. Johnson recalls Ms. Yorio sexually harassing him. Ms. Yorio stated during the interview that, "you're not just a pretty face," in response to one of Mr. Johnson's answers. This occurred in front of another Everyrealm employee, Jesse Stein, who participated in Mr. Johnson's interview.

44.     Mr. Johnson was flummoxed and embarrassed by Ms. Yorio's harassing reference to his looks during what should have been an interview to determine whether Mr. Johnson possessed the skills to succeed in the job for which he was interviewing.

45.     Ms. Yorio made other strange and potentially discriminatory comments that occurred during his interview or, in the alternative, during his tenure at Everyrealm including saying unprompted that she is "part Black."

46.     Nevertheless, excited by the opportunity to join a fast-growing startup, Mr. Johnson left behind a thriving career in commercial real estate and private equity and joined Everyrealm.

II.     **Mr. Johnson Experiences Race-Based Pay Discrimination at Everyrealm**

47.     On March 1, 2022, Defendants offered Mr. Johnson a $125,000 base salary, a discretionary $40,000 bonus, and 0% in equity. Defendant's told Mr. Johnson that this pay package was nonnegotiable and he must take it or leave it. Mr. Johnson has since learned that Everyrealm regularly negotiates pay packages with its white and non-Black employees.

48.     Mr. Johnson has also learned that he was the lowest paid Director in Everyrealm's history. White Directors in roles substantially similar to his were paid hundreds of thousands of dollars more and were granted millions of dollars in Everyrealm and Republic equity, whereas Mr. Johnson was not. Defendants even paid the 23-year-old Strategic Partnerships Associate beneath Mr. Johnson more in base salary than they paid him for no discernible reason other than his race.

49.     Upon information and belief, Defendants Ms. Yorio and Ms. Schwartz determined Mr. Johnson's discriminatory pay package.

III.    **Mr. Johnson Experiences an Adverse Employment Action after Reporting that a Proposed Gambling Scheme was Illegal**

50.     During his employment with Defendants, Mr. Johnson became aware of a proposed new business vertical at Everyrealm that struck him as being clearly illegal.

51.     Defendants proposed a crypto gambling scheme that Mr. Johnson reasonably believed would violate numerous New York and Federal laws. Mr. Johnson reported this reasonable belief to Board Member Julia Schwartz, among others.

52.     The project involved a cryptocurrency version of fantasy sports in which users would buy packs of NFTs representing professional soccer playing cards. Users would enter cryptocurrency into a pool and then win prize money if their NFT playing cards performed better than the other players' NFTs. Mr. Johnson became concerned when he learned that Ms. Schwartz and others wanted the packs of NFT playing cards to disperse randomly to the users playing in each pool. Mr. Johnson reasonably believed that by randomizing the packs of cards the project would qualify as a game of chance and thus be illegal because Everyrealm did not possess a commercial gaming license in New York. Mr. Johnson reported these concerns up Everyrealm's chain of command, and the project was eventually scrapped.

53.     Ms. Schwartz and Ms. Yorio then soured on Mr. Johnson as a result of this. Mr. Johnson was told that he was "in Janine's doghouse." After this occurred, Ms. Yorio and Ms. Schwartz stymied the deals that Mr. Johnson put together for Everyrealm in retaliation.

54.     For example, Mr. Johnson worked closely with Andreessen Horowitz's Cultural Leadership Fund to line up a partnership between Everyrealm and NFL.com. Significant progress was made. After some initial calls, Mr. Johnson scheduled a meeting between Everyrealm and NFL.com. Ms. Schwartz and Mr. Johnson represented Everyrealm in person at this meeting. Mr. Johnson led the meeting, and it went well. NFL.com's representative ended it by saying, "Send us a proposal and I look forward to reading it and showing it to my team."

55.     Mr. Johnson felt that Everyrealm had a leg up on the competition for its bid with NFL.com because of his background as an NFL alumnus. Mr. Johnson took the success of this

potential deal seriously. It occurred to him that if he could close this deal, he would have been the first and only former NFL player working with the NFL in the metaverse.

56.     The Monday after this meeting, Mr. Johnson was working from Everyrealm's New York City office. He created a project plan for the NFL.com proposal and made requests to have 3D graphics designed for the proposal. Ms. Schwartz asked to be "kept in the loop" and stated that she wanted to write the proposal herself. However, it became clear within a couple of days that not only had Ms. Schwartz not started writing the proposal, but she was secretly preventing anyone in her department from providing Mr. Johnson with the 3D graphics he had requested.

57.     By Wednesday of that week Mr. Johnson received an email from NFL.com asking, "Where's the proposal?"

58.     Rather than react with a sense of urgency upon receiving this email, Ms. Schwartz told Mr. Johnson, "What is the hurry?"

59.     Mr. Johnson told the NFL.com representative that he would have the proposal to him by the end of the week and got to work writing it himself. Mr. Johnson outlined ideas that Ms. Yorio had discussed with him including a token-gated skybox meeting place for fans of each NFL team. Mr. Johnson ran the proposal by Everyrealm's General Counsel William Kerr. Mr. Kerr told Mr. Johnson that "This is the first proposal the company has ever written, all Janine does is send term sheets," and gave the proposal positive feedback.

60.     Mr. Johnson still could not get the graphics he had requested but he brought the proposal to Ms. Yorio regardless and told her to change or add to the proposal as she saw fit, sign her name, and email it to the NFL.com representative. Ms. Yorio agreed.

61.     Then, after a meeting with Ms. Schwartz at which Mr. Johnson was not present, Ms. Yorio told Mr. Johnson, "I don't know what *that* was, but we are not sending it," in reference to his proposal, and, "We don't need to be detailed in what we can build out, we need to be vague."

62.     Mr. Johnson's proposal was never sent to the NFL.com representative. Instead, Ms. Yorio sent Everyrealm's company deck, which the representative had already received weeks prior. After not hearing back from NFL.com, Ms. Yorio asked the NFL.com representative, "Where are we on the deal?" Everyrealm still had not received a response two weeks later. Ms. Yorio removed Mr. Johnson from the deal and placed a 23-year-old new-hire on it instead.

## IV.     Mr. Johnson Experiences Racism at Everyrealm

### a.     *Ms. Yorio threatens to "trade" Mr. Johnson*

63.     Mr. Johnson was regularly demeaned, tokenized, and humiliated at work on account of his race. For example, after Mr. Johnson finished leading a successful partnership meeting with LeBron James's entertainment production company, SpringHill, Ms. Yorio— surrounded by white colleagues—told Mr. Johnson that "[You're] lucky that went well, now I don't have to trade you . . .." Mr. Johnson sourced and negotiated this partnership deal only to have a racist joke told at his expense. Ms. Yorio made this same, tired racist joke numerous times. Mr. Johnson understood this joke to be an attempt to imply that Ms. Yorio owned him on account of him being a Black former professional athlete.

### b.     *Ms. Yorio sounds a dog whistle*

64.     Despite Mr. Johnson's stellar academic credentials, his qualifications and intelligence were frequently questioned and disparaged at Everyrealm due to the color of his skin. For instance, on April 23, 2022, Ms. Yorio stated that Mr. Johnson "needs to go. He is not a good representative for us. He isn't smart, he doesn't know asset management and he absolutely does not know our industry. He does not put our best foot forward."

65.     The only meaningful difference between Mr. Johnson and the other employees in external facing roles at Everyrealm is that Mr. Johnson is Black.

66.     Ms. Yorio's allegation that "[Mr. Johnson] isn't smart" is absurd on its face. *See supra* ¶¶ 33-36. Ms. Yorio would not have made this comment but for Mr. Johnson's race.

67.     Mr. Johnson believes that Ms. Yorio's statement that "He does not put our best foot forward" was a racist reference to the belief that external partners would prefer to see a white employee across the table from them.

68.     Ms. Yorio's other justifications are also pure pretext. Nobody "knows" the digital real estate industry yet. It is nascent. This is precisely why Mr. Johnson was hired. He possessed transferable commercial real estate skills that would help Everyrealm establish the digital real estate industry.

69.     Once Ms. Yorio decided that Mr. Johnson "needed to go," she terminated him.

c.     *Ms. Yorio refers to Mr. Johnson as "a stupid Black person"*

70.     In the presence of Everyrealm Board Member Ms. Schwartz and other employees, Ms. Yorio attempted to justify Mr. Johnson's discriminatory termination, saying, "it's worse to have a stupid Black person on the team because then you're really just exploiting them and making it look like you're trying to be diverse."

71.     Mr. Johnson is not "a stupid Black person." Ms. Yorio's comment makes clear that Everyrealm terminated Mr. Johnson solely on account of his race.  Furthermore, no reasonable person would state that a man with Mr. Johnson's readily apparent intelligence and credentials is "stupid" but for racial prejudice.

d.     *Ms. Yorio calls Mr. Johnson "expensive"*

72.     As mentioned, Mr. Johnson facilitated a $500,000 investment into Everyrealm before the company hired him and discriminatorily paid him $125,000. Despite creating significant

15

value for Everyrealm that exceeded his salary, Ms. Yorio referred to Mr. Johnson as "expensive." Mr. Johnson believes that Ms. Yorio chose the word "expensive" to, again, imply that she owned Mr. Johnson. In fact, Mr. Johnson was the lowest paid Director in Everyrealm's history. Given that Mr. Johnson was the lowest paid Director at Everyrealm and objectively created value far in excess of his salary, there can be no reason why Ms. Yorio called Mr. Johnson "expensive" aside from irrelevant racial prejudice.

## V.    Ms. Yorio Creates a Toxic Work Environment and Sexually Harasses Mr. Johnson Again

73.    Mr. Johnson endured numerous inappropriate tirades by Ms. Yorio, including an episode with an external partner present. During roughly his first 10 days on the job, Mr. Johnson had negotiated a favorable deal between Everyrealm and Cookies. Cookies is the world's leading marijuana, cannabidiol ("CBD"), and marijuana apparel company. Before a meeting with Cookies' President Parker Berling (a professional connection of Mr. Johnson's whom he had introduced to Everyrealm), Ms. Yorio agreed in principle to a deal that Mr. Johnson had negotiated. She stated, "Ok, I am fine to sign this [term sheet]. Teyo, tell your boy Parker to be nice to me and then we will make magic for him."

74.    During what was meant to be a celebratory meeting to finalize the partnership with Cookies, and with Mr. Johnson present, Ms. Yorio repeatedly called Mr. Berling a "dick," a "fucking dick," and used the word "dick" at least nine times in response to, among other things, Mr. Berling asking who Everyrealm saw as their competition. Mr. Johnson understood this behavior to be sexually harassing towards everyone who was present.

75.    At one point, Mr. Berling stated, "I've never seen someone react so hostilely to a basic question like this. Are you ok?" The meeting ended without the parties signing the deal. Mr.

Johnson estimates that Everyrealm lost over $20 million in partnership revenue because of this interaction.

76.     The next day, Ms. Yorio told Mr. Johnson, "Fix it" regarding Mr. Berling and Cookies. Mr. Johnson apologized on Ms. Yorio's behalf to Mr. Berling but the damage was done. Mr. Berling and Cookies put the partnership with Everyrealm on hold where it remains.

77.     Soon thereafter, Defendants transferred Mr. Johnson away from Strategic Partnerships into a less desirable Asset Management role. As part of this transfer process, Defendants made Mr. Johnson hand over his entire personal rolodex to Ms. Schwartz and to the employee who replaced him. Defendants' also placed Mr. Johnson on a retaliatory 30-day performance improvement plan.

78.     Mr. Johnson was not offered severance and was not asked to sign a separation agreement when Defendants terminated him.

79.     Mr. Johnson suffered severe damage to his reputation and professional relationships outside of Everyrealm because of the misconduct described herein. Mr. Johnson has also suffered from severe humiliation, chronic sleeplessness, anxiety, stress, and the physical manifestations thereof as a direct result of Defendants' cruel misconduct.

**FIRST CAUSE OF ACTION**
**Discrimination in Violation of Section 1981**
**(All Defendants)**

80.     Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

81.     By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of his race and/or color in violation of Section 1981 by denying him the same terms and conditions of employment available to employees who are white, including,

but not limited to, subjecting him to disparate working conditions and denying him terms and conditions of employment equal to that of employees who are white.

82.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including but not limited to, loss of future income, compensation, and benefits for which he is entitled to an award of damages.

83.     Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff under Section 1981 for which Plaintiff is entitled to an award of punitive damages.

84.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, emotional distress for which he is entitled to an award of compensatory damages.

## SECOND CAUSE OF ACTION
**Violations of New York Labor Law EPL**
**(All Defendants)**

85.     Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

86.     The claims brought herein under the New York Labor Law § 194 are brought on behalf of Plaintiff.

87.     During the period of the employment of Plaintiff, Defendants were subject to the provisions of the New York Labor Law § 194. During the employment of Plaintiff, Defendants required Plaintiff to perform the same or substantially the same job position as white employees, requiring substantially similar skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff at a rate of pay, including salary, bonus, and equity, less

than such white employees. The differential rate of pay was not part of or occasioned by a seniority

system, merit system, a system based on the quantity or quality of production, or upon a bona fide

factor other than race, such as education, training, or experience.

88.     Defendants engaged in patterns, practices and/or policies of employment which

willfully, and in the alternative, unwillfully, discriminated against Plaintiff by paying Plaintiff a

lesser rate of pay, including salary, bonus, and equity, than that paid to white and/or non-Black

employees performing the same or substantially similar job duties which require equal skill, effort,

and responsibility, and under the same working conditions and at the same establishments.

89.     By the actions described above, among others, Defendants have violated the New

York Labor Law.

90.     As a direct and proximate result of Defendants' unlawful and discriminatory

conduct in violation of the New York Labor Law, Plaintiff suffered, and continues to suffer, harm

for which he is entitled to an award of monetary damages and other relief.

91.     Plaintiff is further entitled to liquidated damages, reasonable costs, and attorneys'

fees.

## THIRD CAUSE OF ACTION
### Discrimination in Violation of the NYSHRL
### (All Defendants)

92.     Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully

set forth herein.

93.     By the acts described above, Defendants discriminated against Plaintiff based on

his race, ethnicity, and color in violation of Executive Law of New York, § 296 et seq.

94.     Defendants are liable under the NYSHRL as Plaintiff's "employer."

95.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and will continue to suffer economic harm entitling him to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

96.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, emotional distress and mental anguish entitling him to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

97.     Defendants' unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL, entitling Plaintiff to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### Discrimination in Violation of the NYCHRL
### (All Defendants)

98.     Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

99.     By the acts described above, Defendants discriminated against Plaintiff based on his race, ethnicity, and color in violation of the Administrative Code of the City of New York, § 8-107 et seq.

100.     Defendants are liable under the NYCHRL as Plaintiff's "employer," and because they coerced, intimidated, threatened or interfered with, or attempted to coerce, intimidate, threaten, or interfere with, Plaintiff's exercise or enjoyment of rights granted or protected under Section 8-107 of the Administrative Code of the City of New York.

101.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and will continue to suffer economic harm entitling him to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

102.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, emotional distress and mental anguish, entitling him to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

103.    Defendants' unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL entitling Plaintiff to an award of punitive damages.

### FIFTH CAUSE OF ACTION
**Aiding and Abetting/Inciting/Compelling/Coercing in Violation of the NYSHRL**
**(All Defendants)**

104.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

105.    Defendants knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment, and retaliation against Plaintiff in violation of the NYSHRL.

106.    As a direct and proximate result, Plaintiff suffered and continues to suffer monetary and/or economic harm, including, but not limited to, loss of past income, future income, compensation, and benefits, for which he is entitled to an award of monetary damages and other relief.

107.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, emotional distress for which he is entitled to an award of monetary damages and other relief.

108.    Defendants unlawful, discriminatory, and retaliatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### Aiding and Abetting/Inciting/Compelling/Coercing in Violation of the NYCHRL
### (All Defendants)

109.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

110.    Defendants knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment, and retaliation against Plaintiff in violation of the NYCHRL.

111.    As a direct and proximate result, Plaintiff suffered and continues to suffer monetary and/or economic harm, including, but not limited to, loss of past income, future income, compensation, and benefits, for which he is entitled to an award of monetary damages and other relief.

112.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, emotional distress for which he is entitled to an award of monetary damages and other relief.

113.    Defendants unlawful, discriminatory, and retaliatory actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### Whistleblower Retaliation in Violation of NYLL § 740
### (All Defendants)

114.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

115.    As detailed above, Defendant subjected Plaintiff to multiple adverse employment actions because Plaintiff disclosed and/or objected to an activity, policy, or practice of Defendant that is in violation of a law, rule, or regulation that creates a substantial and specific danger to the public health or safety, including, but not limited to, regulated games of chance and gambling.

116.    Defendants retaliated against Plaintiff in violation of the NYLL by adversely altering the terms and conditions of his employment by transferring him to a new department and sabotaging his work because he reported up the Everyrealm chain of command to redress, among other things, Defendants' proposed unlawful line of business.

117.    As a direct and proximate result of Defendant's willful and unlawful conduct in violation of the NYLL, Plaintiff has suffered, and continues to suffer, harm for which he is entitled to an award of damages, to the greatest extent permitted by law.

118.    The foregoing conduct of Defendants constitutes willful violations of the NYLL for which Plaintiff is entitled to an award of punitive and/or liquidated damages.

## EIGHTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Defendants except Ms. Schwartz)

119.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

120.    Defendants engaged in conduct toward Mr. Johnson that is extreme and outrageous so as to exceed the bounds of decency in a civilized society; namely by, *inter alia*, making repeated references at work in front of others to the odious idea that Defendants own Mr. Johnson on account of his race.

121.    These actions were taken with the intent to cause, or disregard for, the substantial probability of causing severe emotional distress.

122.    As a direct and proximate result of Defendants' extreme and outrageous conduct, Mr. Johnson has suffered severe emotional distress.

123.    Defendants' conduct was wanton, malicious, willful and/or cruel, entitling Mr. Johnson to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in an amount to be determined at trial for the following relief:

A.    a declaratory judgment that the actions, conduct, and practices of Defendants violated federal, state, and city laws;

B.    an award of economic damages;

C.    an award of compensatory damages;

D.    an award of monetary damages for mental anguish and emotional distress;

E.    an award of punitive damages;

F.    an award of such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

G.    an award of reasonable attorneys' fees, costs, and expenses of this action;

H.    permanent equitable and injunctive relief; and

I.    such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

**Dated:** August 5, 2022
       New York, New York

Respectfully submitted,


*/s/ Shane Seppinni*

Shane Seppinni
Seppinni LLP
43 W 43rd St., Suite 256
New York, NY 10036
212-849-7000
shane@seppinnilaw.com

*Counsel for Plaintiff Teyo Johnson*