# Exhibit D

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

TEYO JOHNSON,

                      Plaintiff,

        v.

EVERYREALM INC., COMPOUND ASSET
MANAGEMENT LLC, REALM METAVERSE REAL
ESTATE INC., REPUBLIC, REPUBLIC CRYPTO
LLC, REPUBLIC REALM MANAGER LLC,
REPUBLIC REALM INC., REPUBLIC
OPERATIONS LLC, OPENDEAL INC., OPENDEAL
PORTAL LLC, WILLIAM KERR in his individual and
professional capacities, JULIA SCHWARTZ in her
individual and professional capacities, and JANINE
YORIO in her individual and professional capacities,

                      Defendants.

Index No.: 1:22-cv-06669

**FIRST AMENDED COMPLAINT**

**Jury Trial Demanded**

---

        Plaintiff Teyo Johnson, by his counsel, Seppinni LLP, alleges based on information and

belief, at all relevant times, as follows:

**PRELIMINARY STATEMENT**

        1.      Defendants used their positions of power to sexually harass, discriminate against,

and retaliate against former Everyrealm[1] employee Teyo Johnson.

        2.      These allegations include, among others:

- Sexually harassing "games" in which Mr. Johnson was pressured by Ms. Yorio
  and other Everyrealm board members and executives to have sexual intercourse
  with coworkers and clients;

---

[1] "Everyrealm" includes reference to Everyrealm Inc., Compound Asset Management LLC, Realm Metaverse Real
Estate Inc., Republic, Republic Realm Manager LLC, Republic Crypto LLC, Republic Operations LLC, Opendeal
Inc., Opendeal Portal LLC, and Republic Realm Inc., where relevant herein.

- Sexually harassing questioning regarding Mr. Johnson's sex life outside of work;

- The use of sexually crude and harassing nicknames used to describe the celebrity investors whom Mr. Johnson was tasked with managing;

- Spreading sexually harassing rumors through Everyrealm about Mr. Johnson's sex life and his then-girlfriend's menstruation;

- The use of despicable racist and sexual slurs by Ms. Yorio against Mr. Johnson and others, some of which are detailed herein (including "the whitest Black person," "stupid Black person," "dick," "Big Swinging Dick," and "fucking dick")

- Sexually harassing slurs in conversations with Everyrealm employees by Ms. Yorio to describe subordinates and create a hostile environment:




- Racist commentary made by Defendants at Mr. Johnson's expense—including comments by Ms. Yorio threatening to "trade" him if he did not perform and other comments implying that Ms. Yorio owned Mr. Johnson; and

- Retaliation after Mr. Johnson reported that a proposed crypto gambling business initiative would violate multiple laws.

3.     Everyrealm is a digital real estate company that invests in and develops virtual worlds.[2]

4.     Defendants parlayed media attention around the opaque sale of the company's so-called Metaflower Super Mega Yacht[3, 4, 5] into a roughly $60,000,000 Series A investment round valuing Everyrealm at what is rumored to be over $195,000,000. Blue-chip investors participated including Andreessen Horowitz (led by Arianna Simpson[6]), Lightspeed Venture Partners, Coinbase Ventures, Dapper Labs, NGC Ventures, Dragonfly Capital, Liberty City Ventures, and Hash, among others.[7]

---

[2] Crunchbase, Everyrealm Financials, https://www.crunchbase.com/organization/Everyrealm (last visited on

[3] Tony Ho Tran, Futurism, *Someone Paid $650,000 for a Nonexistent Yacht in the Metaverse: The Yacht is Comically Hideous, and can only be Described as "Minecraft-Esque" with its Block Design*, https://futurism.com/the-byte/650000-nft-yacht-metaverse (last visited Jul 31, 2022).

[4] Archyde, Technology News, *Would You Buy a Virtual Yacht for 650 thousand dollars on the Internet?*, https://www.archyde.com/would-you-buy-a-virtual-yacht-for-650-thousand-dollars-on-the-internet-technology-news-technology/ (last visited Jul. 31, 2022).

[5] Daily Telegraph NZ, Tech, *Virtual Megayacht Sold for $650k: A Yacht Featuring two Helipads, a hot tub, and a DJ Booth has been Sold for a Whopping $650,000 in the Sandbox Virtual Gaming World.* **The Identity of the Metaflower Super Mega Yacht's Buyer is Unknown**, https://dailytelegraph.co.nz/tech/virtual-mega-yacht-sold-for-650k/ (emphasis added) (last visited Jul. 31, 2022).

[6] Anita Ramaswamy, *Republic's Metaverse Real Estate Arm Spins off, Rebrands as Everyrealm,* TechCrunch, https://techcrunch.com/2022/02/10/republics-metaverse-real-estate-arm-spins-off-rebrands-as-everyrealm/ (last visited Jul. 31, 2022)

[7] PitchBook Private Report.

5.      Everyrealm's parent company, Republic,[8, 9] owned a sizable portion of Everyrealm's equity prior to the Series A financing round.

6.      Republic used the Series A financing round to cash-out much of its equity ownership in its subsidiary but retains functional control over Everyrealm's day-to-day operations and its Board of Directors.[10] For example, Republic co-founder Andrew Durgee is Everyrealm's Managing Director and, upon information and belief, Chairman of Everyrealm's Board of Directors.[11]

7.      Everyrealm's list of celebrity and influencer investors hoping to cash-in on the company's promises is long and includes Will Smith (via Dreamers VC), The Weeknd, Nas, Post Malone (via Electric Feel Ventures), Lil Baby, Paris Hilton, Brie Larson, Gene Simmons, Gunna,

---

[8] Andrew Hayward, Decrypt, *Metaverse Land Investor Everyrealm Raises $60M Led by Andreessen*, https://decrypt.co/92664/metaverse-everyrealm-raises-60m-andreessen ("…**parent company Republic**, which remains a minority investor[.]" (Emphasis added) (last visited Jul. 31, 2022).

[9] Anita Ramaswamy, *Republic's Metaverse Real Estate Arm Spins off, Rebrands as Everyrealm,* TechCrunch, https://techcrunch.com/2022/02/10/republics-metaverse-real-estate-arm-spins-off-rebrands-as-everyrealm/ ("**Republic** has been an active investor in metaverse real estate properties **through its Republic Realm division**, headed since June 2020 by Janine Yorio.") (Emphasis added) (last visited Jul. 31, 2022).

[10] SEC.gov, EDGAR, *Everyrealm/Realm Metaverse Real Estate Inc. Preliminary Offering Circular*, https://www.sec.gov/Archives/edgar/data/1854001/000149315222007846/partiiandiii.htm#a_009 at 32, 43 ("The Company has engaged Republic Realm Manager, LLC (the '*Manager*'), a Delaware limited liability company controlled by Everyrealm Inc. (an entity formed on September 28, 2021 under the name Republic Realm Inc., after the Company changed its name to Realm Metaverse Real Estate Inc., thus making its former name available, and renamed Everyrealm Inc. on February 3, 2022), to provide management services to the Company in accordance with a management agreement (the '*Management Agreement*'). Two individuals – Jesse Stein and Janine Yorio – who are agents of the Manager and Everyrealm Inc., serve, together with Andrew Durgee (all three, collectively, the "*Principals*"), as the executive officers of the Company and as the members of its board of directors. Under the Management Agreement, the Manager (i) assists in screening and evaluating business proposals and opportunities for the Company, (ii) assists as needed in respect of transactions under which the Company makes investments, (iii) monitors the holdings of the Company, and (iv) evaluates liquidity options and dispositions for assets held by the Company. The Manager is the sole owner of Class A Shares and, as of the date of this Offering Circular, has effective voting control of the Company. Republic Realm Inc. became the Manager's managing member and majority interest holder, when Compound Asset Management, LLC assigned and transferred, to Republic Realm Inc., Compound Asset Management, LLC's ownership interest and management responsibilities in the Manager. Everyrealm Inc. and Compound Asset Management, LLC are affiliated.") (Last visited Aug. 2, 2022).

[11] *Id.*

4

Baby Keem, Hannah Bronfman, Fara Leff, Ebonie Ward, Miye Oni, Belly, Pro Logic, Mark Pincus, Jeffrey Zirlin, Anthony Saleh, NAV, Randi Zuckerberg, Wassim "SAL" Slaiby, Amir "Cash" Esmailian, Nancy Ajram, Mario Götze, Marc Anthony, and Jeffrey Katzenberg.

8.     Andreessen Horowitz's Cultural Leadership Fund facilitated many of these celebrity and influencer investor introductions.[12]

9.     Defendants hired Plaintiff Teyo Johnson to manage these celebrity relationships and to develop new celebrity, sports, and brand partnerships for the company. Before Everyrealm terminated Mr. Johnson without notice he was a high performing Director there.

10.     Defendants brazenly and repeatedly sexually harassed and discriminated against Mr. Johnson on account of his gender, race, ethnicity, pattern of speech, and skin color.

11.     Since Mr. Johnson confidentially made Defendants' aware of much of the misconduct described herein, Everyrealm has threatened him with lawsuits, sanctions, and personal liability if he files this lawsuit, and has repeatedly demanded that he sit "individually" for a two-hour investigatory interview with Defendants' "independent" investigator.

12.     Everyrealm made good on these threats when they initiated an arbitration lawsuit against him in September 2022.

13.     As a result of Defendants' unlawful conduct and the hostile work environment it created, Mr. Johnson asserts claims of discrimination under 42 U.S.C. § 1981 ("Section 1981"); discrimination, retaliation, sexual harassment, and interference with his protected rights under the New York City Human Rights Laws ("NYCHRL"), N.Y.C. Admin. Code, §§ 8-107, et seq.; claims

---

[12] Retail Technology Innovation Hub, *Paris Hilton and Various Other Celebs Back Metaverse Startup Everyrealm,* https://retailtechinnovationhub.com/home/2022/3/23/paris-hilton-and-various-other-celebs-back-metaverse-startup-everyrealm#:~:text=The%20venture's%20latest%20investors%20include,%2C%20Pro%20Logic%2C%20and%20NAV (last visited Jul. 31, 2022).

of discrimination, retaliation, sexual harassment, and interference with his protected rights under the New York State Human Rights Laws ("NYSHRL"), pay discrimination under New York Labor Law § 194 ("EPL"); claims of whistleblower retaliation under the New York Whistleblower Law N.Y. Labor Law § 740, et seq., and claims of common law Intentional Infliction of Emotional Distress. Mr. Johnson seeks declaratory relief, monetary damages, attorneys' fees, and all other appropriate relief.

## THE PARTIES

14.     Plaintiff Teyo Johnson is a citizen of the State of Nevada. He is 40 years old at the time of this writing. At the times relevant herein he worked in New York, New York, the improper acts committed against him had their impact in New York, New York, and Mr. Johnson was assigned to Everyrealm's New York, New York office for at least two weeks per month. At all relevant times, Mr. Johnson met the definition of an "employee" and/or "eligible employee" under all applicable statutes. At all relevant times herein, Mr. Johnson was an employee of Defendant Everyrealm and/or Defendant Republic.

15.     Defendant Everyrealm Inc. is a so-called digital real estate company and a Delaware corporation with its principal place of business in New York, New York. Everyrealm is a subsidiary or affiliate of Republic. Upon information and belief, Everyrealm acts as a contractor and/or agent to various public companies, and it or its parent company is regulated by the Securities and Exchange Commission ("SEC").[13, 14] At all relevant times, Everyrealm met the definition of an "employer" or "covered employer" under all applicable statutes.

---

[13] SEC.gov, EDGAR, *Everyrealm/Realm Metaverse Real Estate Inc. Preliminary Offering Circular*, https://www.sec.gov/Archives/edgar/data/1854001/000149315222007846/partiiandiii.htm#a_009

[14] Republic.co, Disclaimer, https://republic.com/, ("a funding portal which is registered with the US Securities and Exchange Commission (SEC) as a funding portal (Portal) and is a member of the Financial Industry Regulatory Authority (FINRA)") (last visited Aug. 4, 2022).

16.     Defendant Realm Metaverse Real Estate Inc. is a Delaware corporation with its principal place of business in New York, New York. It is a subsidiary or alter ego of Everyrealm Inc. and/or Republic. At all relevant times, Realm Metaverse Real Estate Inc. met the definition of an "employer" or "covered employer" under all applicable statutes.

17.     Defendant Compound Asset Management, LLC is a New York Limited Liability Corporation with its principal place of business in New York, New York. It is affiliated with and/or a subsidiary or alter ego of Everyrealm, Inc. and/or Republic. At all relevant times, Compound Asset Management, LLC met the definition of an "employer" or "covered employer" under all applicable statutes.

18.     Defendant Republic, an alternative asset crowdfunding company and a Delaware Corporation, is Everyrealm's parent company and/or, in the alternative, was Everyrealm's parent company at times relevant herein. Republic may be a trade name of Defendants Republic Operations LLC, Opendeal Inc., Opendeal Portal LLC, Republic Realm Manager LLC, and Republic Crypto LLC, *inter alia*. At all relevant times, Republic met the definition of an "employer" or "covered employer" under all applicable statutes. Any use of "Republic" in this complaint includes reference to Republic's Defendant subsidiaries and affiliates. Republic is regulated by the SEC.[15]

19.     Defendant Republic Realm Manager LLC is a Delaware Limited Liability Corporation that upon information and belief operates under the trade name Republic. At all relevant times, Republic Realm Manager LLC met the definition of an "employer" or "covered employer" under all applicable statutes.

---

[15] Republic.co, Disclaimer, https://republic.com/, ("a funding portal which is registered with the US Securities and Exchange Commission (SEC) as a funding portal (Portal) and is a member of the Financial Industry Regulatory Authority (FINRA).") (last visited Aug. 4, 2022).

20.     Defendant Republic Crypto LLC is a Delaware Limited Liability Corporation that upon information and belief operates under the trade name Republic. At all relevant times, Republic Crypto LLC met the definition of an "employer" or "covered employer" under all applicable statutes.

21.     Defendant Republic Operations LLC is a Delaware Limited Liability Corporation that upon information and belief operates under the trade name Republic. At all relevant times, Republic Operations LLC met the definition of an "employer" or "covered employer" under all applicable statutes.

22.     Defendant Opendeal Inc. is a Delaware Corporation that upon information and belief operates under the trade name Republic. At all relevant times, Opendeal Inc. met the definition of an "employer" or "covered employer" under all applicable statutes.

23.     Defendant Opendeal Portal LLC is a Delaware Limited Liability Corporation that upon information and belief operates under the trade name Republic. At all relevant times, Opendeal Portal LLC met the definition of an "employer" or "covered employer" under all applicable statutes.

24.     Defendant William Kerr is Everyrealm's General Counsel. At all relevant times, Mr. Kerr was employed by and/or in the alternative acted as an agent of Everyrealm and/or Republic. Mr. Kerr met the definition of an "employer" or "covered employer under all applicable statutes.

25.     Defendant Janine Yorio is a member of Everyrealm's Board of Directors and its CEO. At all relevant times, Ms. Yorio was employed by Everyrealm and/or Republic and met the definition of an "employer" or "covered employer" under all applicable statutes.

26. Defendant Julia Schwartz is a member of Everyrealm's Board of Directors and an Everyrealm employee. At all relevant times, Ms. Schwartz was employed by Everyrealm and/or Republic and met the definition of an "employer" or "covered employer" under all applicable statutes.

## JURISDICTION AND VENUE

27. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under federal law.

28. The Court has diversity jurisdiction over this action pursuant to 28 U.S.C § 1332, as there is diversity of citizenship between Plaintiff, a resident of the State of Nevada, and Defendants, who are either, upon information and belief, New York State residents and/or are headquartered in New York State, and this action involves a matter in controversy that exceeds $75,000, exclusive of interest and cost.

29. This Court has supplemental subject matter jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

30. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district. Defendants' principal place of business is in this district.

## ADMINISTRATIVE PROCEDURES

31. Following the commencement of this action, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff will file

a Second Amended Complaint to include claims under Title VII upon receipt of a Notice of Right to Sue.

32.     Following the commencement of this action, Plaintiff may file an Administrative Complaint with the Occupational Safety and Health Administration ("OSHA") of the U.S. Department of Labor, alleging violations of the whistleblower provisions of the Sarbanes-Oxley Act. Plaintiff intends to file an Amended Complaint to include claims under the Sarbanes-Oxley Act upon receipt of a letter from OSHA providing him with an administrative dismissal and withdrawal of the Administrative Complaint.

33.     Pursuant to NYCHRL § 8-502, Plaintiff served a copy of the Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel within ten days of filing the Complaint, thereby satisfying the notice requirements of this action.

34.     Plaintiff has complied with any and all other prerequisites to filing this action.

## **FACTUAL ALLEGATIONS**

35.     Mr. Johnson is a shrewd and intelligent businessman. Prior to launching a career in private equity and commercial real estate he was a highly touted National Football League ("NFL") draft pick and completed a successful career in the NFL.

36.     Before joining the NFL, Mr. Johnson was a brilliant student at Stanford University and a two-sport athlete. This feat is unheard of in modern collegiate sports. There are some two-sport college athletes, but none who can claim to have been a starter on one of the best college basketball teams at the time for their "second" sport, Pac-10 Player of the Year in Football, and who successfully managed a full course load at a school as academically rigorous as Stanford University.

10

37.     Prior to Everyrealm, Mr. Johnson's career in corporate America picked up where his stellar athletic career left off. For example, Mr. Johnson facilitated the only known private equity investment by a person of color, James Harden, into Space X's private funding round that valued the company at $40 billion.

38.     Mr. Johnson also maintains an active business relationship with his former teammate and National Basketball Association legend, Yao Ming. Mr. Johnson consults as a sales director for Mr. Ming's Yao Family Wines and recently negotiated a significant deal between MGM Resorts and Mr. Ming's company.

39.     Unfortunately, Ms. Yorio and other Defendants could not see past their prejudices when it came to Mr. Johnson and his role at Everyrealm.

**I.     Mr. Johnson Faces Race Discrimination and Sexual Harassment as a Job Applicant at Everyrealm**

40.     Before Mr. Johnson was invited to apply to work at Everyrealm he facilitated an introduction between a professional connection of his and Ms. Yorio that led to a $500,000 investment into Everyrealm's Series A round. Defendants were impressed by this, Mr. Johnson's professional network, his experience in commercial real estate, and his skills. Everyrealm subsequently interviewed Mr. Johnson and soon thereafter hired him to be the company's Director of Strategic Partnerships.

41.     In July 2022, Mr. Johnson learned that he was the victim of prejudice and racism at Everyrealm as early as the interview process.

42.     Everyrealm's former Human Resources ("HR") Director reports that during a candidate debrief following Mr. Johnson's interview with Ms. Yorio, Ms. Yorio stated, "Teyo is the whitest Black guy I've ever met."

43.     Everyrealm's HR Director responded, "Hey, we don't say that."

11

44.     Ms. Yorio doubled down: "No, I meant it in a good way."

45.     Everyrealm's HR Director told Ms. Yorio, "There is no good way."

46.     Just prior to this incident, during Mr. Johnson's interview, Mr. Johnson recalls Ms. Yorio sexually harassing him.

47.     Ms. Yorio stated during the interview that, "you're not just a pretty face," in response to one of Mr. Johnson's answers. This occurred in front of another Everyrealm employee, Jesse Stein, who participated in Mr. Johnson's interview.

48.     Mr. Johnson was surprised and embarrassed by Ms. Yorio's harassing reference to his looks during what should have been an interview to determine whether Mr. Johnson possessed the skills to succeed in the job for which he was interviewing.

49.     Ms. Yorio made other strange and potentially discriminatory comments that occurred during his interview or, in the alternative, during his tenure at Everyrealm including saying unprompted to Mr. Johnson that she is "part Black."

50.     Nevertheless, excited by the opportunity to join a fast-growing startup and to become the first ex-NFL player to enter the Metaverse, Mr. Johnson left behind a thriving career in commercial real estate and private equity and joined Everyrealm.

## II.     Mr. Johnson Experiences Unrelenting Sexual Harassment at Everyrealm

51.     Mr. Johnson experienced unrelenting harassment that was unsolicited, unwanted, and sexual in nature throughout his Everyrealm tenure. He was the target of and witness to sexually offensive remarks and jokes, comments and questions regarding his and others' sex lives, sexually harassing bullying regarding his then girlfriend's menstrual cycle, he was pressured to participate in sexual games with Everyrealm coworkers and clients, and was subject

to sexually explicit rants and tirades at work. The harassment was so severe that it often made it impossible for Mr. Johnson to carry out his duties.

52.     The sexual harassment described in this Amended Complaint violates local law, state law, federal law, and Everyrealm's policy on harassment and sexual harassment found in its employee handbook, which, in addition to stating that Everyrealm employees can file discrimination and harassment claims in Federal court (Employee Handbook at 13 (". . . the EEOC will issue a Right to Sue letter **permitting the individual to file a complaint in federal court**. . . . **Federal courts may award remedies if discrimination is found to have occurred.**")), states:

> Harassment generally is defined in this policy as unwelcome verbal, visual or physical conduct that denigrates or shows hostility or aversion toward an individual because of any actual or perceived protected characteristic or has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment. **Harassment can be verbal (including slurs, jokes, insults, epithets, gestures or teasing)**, visual (including offensive posters, symbols, cartoons, drawings, computer displays, text messages, social media posts or e-mails) or physical conduct (including physically threatening another, blocking someone's way, etc.). Such conduct violates this policy, even if it does not rise to the level of a violation of applicable federal, state or local laws. Because it is difficult to define unlawful harassment, employees are expected to **behave at all times** in a manner consistent with the intended purpose of this policy. . . . Sexual harassment can include all of the above actions, as well as other unwelcome conduct, such as **unwelcome or unsolicited** sexual advances, requests for sexual favors, **conversations regarding sexual activities** and other verbal, visual or physical conduct of a sexual nature when: **submission to that conduct or those advances or requests is made either explicitly or implicitly a term or condition of an individual's employment**; or submission to or rejection of the conduct or advances or requests by an individual is used as the basis for employment decisions affecting the individual; or **the conduct or advances or requests have the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment**. Examples of conduct that violate this policy include: 1. **unwelcome flirtations**, leering, whistling, touching, pinching, assault, blocking normal movement; 2. requests for sexual favors or demands for sexual favors in exchange for favorable treatment; 3. **obscene or vulgar** gestures, posters or **comments**; 4. **sexual jokes or comments about a person's**

body, sexual prowess or sexual deficiencies; 5. **propositions or suggestive or insulting comments of a sexual nature**; 6. derogatory cartoons, posters and drawings; 7. sexually-explicit e-mails, text messages or voicemails; 8. uninvited touching of a sexual nature; 9. **unwelcome sexually-related comments**; 10. **conversation about one's own or someone else's sex life**; 11. conduct or **comments consistently targeted at only one gender, even if the content is not sexual**; and 12. **teasing or other conduct directed toward a person because of the person's gender**.[16] (Emphasis added).

### a. Defendants attempt to coerce Mr. Johnson into playing sexually harassing games in the workplace

53.     Just days after joining Everyrealm, Mr. Johnson attended South by Southwest ("SXSW") on a work trip that included Ms. Yorio and other Everyrealm employees and executives. SXSW took place from March 11 through 20, 2022.[17]

54.     It was during this trip that Ms. Yorio first told Mr. Johnson about a sex-related game that she encouraged employees to play.

55.     Ms. Yorio called the game "KYP," short for "Know Your Personnel." Ms. Yorio went on to explain to Mr. Johnson that other variants of the game exist including "KYC," short for "Know Your Client."

56.     Ms. Yorio explained that these game names were euphemisms for "having sex" or "hooking up" with coworkers and business partners.

57.     Ms. Yorio instructed Mr. Johnson that the way to play the game was to "get laid" by a coworker while on a business trip.

58.     Ms. Yorio then asked Mr. Johnson if he would be "doing any KYP[.]"

---

[16] Ex. A, EVERYREALM Employee Handbook, at 10-11 (April 2022).
[17] Mashable, *SXSW 2022: What to Expect*, https://mashable.com/article/sxsw-2022-what-to-expect (accessed Oct. 13, 2022).

59.     In other words, Ms. Yorio asked Mr. Johnson if he planned on having sex or hooking up with any coworkers during SXSW, insinuating that doing so was strongly encouraged.

60.     Mr. Johnson, taken aback by Ms. Yorio's unwelcomed and inappropriate questioning, politely informed her that he was "[a]lready really close with someone," and was relieved when Ms. Yorio dropped the topic for the time being.

61.     But later that same night, Ms. Yorio confronted Mr. Johnson at the hotel and told him that she "know[s]" that he is in a relationship "right now" but that she thought he "would cheat on [his girlfriend] if the opportunity arises," insinuating that she believed, without evidence, that Mr. Johnson was promiscuous.

62.     Mr. Johnson was mortified and dismayed. It was apparent to him that Ms. Yorio, the CEO of his new employer who had told him during his interview that "he was more than just a pretty face," was inappropriately "testing the waters" with him.

63.     To Mr. Johnson, he and Ms. Yorio were colleagues and nothing more. He was her subordinate. And yet, late at night, Ms. Yorio came to Mr. Johnson at their hotel and insinuated in no uncertain terms that she believed he would, and even encouraged him to, cheat on his significant other to participate in the company's KYP game.

64.     Mr. Johnson declined to participate in the KYP game.

65.     Once Mr. Johnson and the company were back from SXSW and in the New York City office, Ms. Yorio repeatedly asked Mr. Johnson if he had "done" or would do "any KYP."

66.     Mr. Johnson repeatedly informed Ms. Yorio that he had no interest in having sexual relationships with his coworkers nor Everyrealm's potential business partners.

67.     While Mr. Johnson was in the Everyrealm New York City office, he was subjected to yet another sexually harassing conversation regarding the KYP game that occurred between Ms. Yorio and Everyrealm's Head of Gaming, Zachary Hungate.

68.     Ms. Yorio and Mr. Hungate were talking loudly so that others, including Mr. Johnson, would overhear them. During their conversation, the two gossiped about which employees at the company were allowed to date each other and which were already in relationships.

69.     Ms. Yorio asked Mr. Hungate who at Everyrealm was going to date an employee named Rachel. Mr. Hungate responded that Rachel was "for Tyler."

70.     Ms. Yorio, rather than reprimand Mr. Hungate for speaking about an Everyrealm employee as though she was an object who could be claimed, responded to this comment with, "Oh, ok."

71.     All Mr. Johnson wanted to do was his job, but even in the conversations that occurred around his desk he could not escape the sexual harassment-filled toxic hostile work environment that Defendants knowingly facilitated at Everyrealm.

**b.  Ms. Yorio and Ms. Schwartz sexually harass Mr. Johnson regarding his girlfriend's menstrual cycle**

72.     Sometime on or after March 21, 2022, Everyrealm hosted a company-wide party in its New York City office. Mr. Johnson was in attendance.

73.     Prior to this party, Ms. Yorio, Ms. Schwartz, and another Everyrealm co-founder encouraged Mr. Johnson to bring a plus-one.

16

74.     Mr. Johnson reluctantly brought his then-girlfriend (and friend of 15 years) with him to the party. His then-girlfriend suffered from severe anxiety and brought a service dog with her to help manage her anxiety disorder.

75.     When Mr. Johnson and his guest arrived at the party, Ms. Yorio and Ms. Schwartz refused to acknowledge Mr. Johnson and instead gave him and his guest dirty looks.

76.     Mr. Johnson's guest picked up on the negative tension and dirty looks and told him that she was "very uncomfortable" and "want[ed] to leave" minutes after arriving.

77.     Mr. Johnson did not drink alcohol during the party that night.

78.     The day after the party, in Everyrealm's New York Office, Ms. Yorio and Ms. Schwartz began repeatedly making fun of Mr. Johnson's girlfriend to Mr. Johnson and to other Everyrealm employees in bullying and sexually harassing ways. Mr. Johnson has described their behavior as being like a scene ripped from the movie "Mean Girls."

79.     Defendants nicknamed Mr. Johnson's girlfriend "Dog in a Bag" and told Mr. Johnson and other Everyrealm employees that they thought "Dog in a Bag" was lying about her mental illness so that she could bring her dog around "like Paris Hilton."

80.     From this point forward, Defendants only referred to Mr. Johnson's girlfriend as "Dog in a Bag" in their interactions with Mr. Johnson and certain other Everyrealm employees.

81.     The day after the party, Ms. Yorio told Everyrealm employees in the New York City office that "everyone was dragging ass" from the party the night before.

82.     That same day, Ms. Yorio approached Mr. Johnson's desk and asked if he was late because he "hooked up with Dog in a Bag?" Mr. Johnson responded "No, and I wasn't late."

83.     Ms. Yorio then asked if Mr. Johnson "got laid" the night before and he again told her "No."

84.     Mr. Johnson made it abundantly clear that he was uncomfortable and did not want to continue discussing whether he and his guest had had sex the night before.

85.     Not satisfied with Mr. Johnson's answer, Ms. Yorio pried and repeatedly asked why Mr. Johnson and "Dog in a Bag" did not "hook up."

86.     Mr. Johnson was deeply uncomfortable with Ms. Yorio's questions about his sex life but was concerned about not being viewed as a team player in his new job. So, he reluctantly gave in and shared that his girlfriend was menstruating so that Ms. Yorio would stop bothering him about his sex life and let him return to his work.

87.     After this exchange, Ms. Yorio told multiple people in the Everyrealm New York City office that Mr. Johnson was "walking around telling people that 'Dog in a Bag is on the rag.'"

88.     Mr. Johnson felt humiliated and angry that something of a highly personal nature that he shared with Ms. Yorio in confidence because of her relentless questioning was being used against him to imply that he was disrespectful towards his close friend of over 15 years.

**c.  Ms. Yorio discusses her sexual orientation theories regarding Mr. Johnson's coworkers with him**

89.     During the work trip to SXSW, Ms. Yorio subjected Mr. Johnson to more sexual harassment.

90.     On or about March 13 or 14, 2022, Ms. Yorio shared with a group of employees, including Mr. Johnson, that she believes that one of her cofounders is "an incel[18]," and that he was "in love with" a "Japanese guy" who was also attending SXSW.

---

[18] "Incel" is a portmanteau of involuntary and celibate.

91.     Mr. Johnson sat in silence during this sexually harassing commentary and hoped it was a one-off event and that Ms. Yorio would stop.

92.     Ms. Yorio did not stop.

93.     Later that night, Ms. Yorio told Mr. Johnson and the other employees nearby that she hoped that her cofounder and this person would "have gay sex."

94.     Mr. Johnson was stunned and humiliated to have to endure these conversations in front of other coworkers. He was under the impression that SXSW would be an opportunity for him to network on Everyrealm's behalf and source potential business partnerships. Instead, he was subjected to the company CEO's harassing theories about a cofounder's sex life.

95.     Mr. Johnson was afraid that if he told Ms. Yorio to stop, he would be punished or terminated. Mr. Johnson had just recently started working at the company, was the only Black man currently working at Everyrealm (to his knowledge), and feared that if he spoke up, he would be perceived as aggressive or opposing the company's CEO.

96.     The sexual harassment Mr. Johnson experienced did not stop.

**d.      Defendants mock investor Paris Hilton and sexually harass Mr. Johnson as a precondition to carrying out his investor relations duties**

97.     Beginning on or after March 7, 2022, Mr. Kerr called Mr. Johnson over for a meeting in Everyrealm's New York City office, ostensibly to discuss Mr. Johnson's responsibilities in his new role.

98.     During their conversation, Mr. Kerr informed Mr. Johnson that he was transitioning responsibility for managing celebrity investor relationships and investor relations more broadly to Mr. Johnson.

19

99.     Mr. Johnson was caught off guard when Mr. Kerr referred to an Everyrealm investor as "A Night in Paris."

100.    Confused, Mr. Johnson asked Mr. Kerr what he was talking about.

101.    Mr. Kerr stated that "A Night in Paris" is what he and others at Everyrealm called one of their celebrity investors, Paris Hilton.

102.    *A Night in Paris* is the name of the revenge pornography film that leaked online involving Ms. Hilton.

103.    Mr. Johnson was disturbed to learn that Mr. Kerr and other Everyrealm executives referred to anyone, let alone a prominent Everyrealm investor, by the name of a piece of celebrity revenge pornography that had been "leaked online without [Ms. Hilton's] consent."[19]

104.    From this meeting forth, Mr. Kerr and other Everyrealm executives referred to Ms. Hilton as "A Night in Paris" in Mr. Johnson's presence.

105.    Mr. Johnson did not wish to use this sexually derogatory nickname to refer to Ms. Hilton. Mr. Johnson was horrified that in order to carry out his job duties he was made listen to the derogatory commentary and sexually harassing nickname that Defendants assigned an investor whom Mr. Johnson was tasked with managing.

106.    This sexual harassment of Mr. Johnson continued through until he was terminated.

**e.  Ms. Yorio repeatedly refers to business partners' genitals to Mr. Johnson and in Mr. Johnson's presence**

107.    Ms. Yorio made a habit of referring to external partners' genitals in her interactions with Mr. Johnson. Mr. Johnson did not want this to occur. This behavior was so severe and

---

[19] Ilana Kaplan, New York Times, *Who is Paris Hilton, Really?*, https://www.nytimes.com/2020/09/12/style/paris-hilton-documentary.html (accessed Oct. 13, 2022).

pervasive that it eventually torpedoed a partnership that Mr. Johnson had negotiated through to a mutually agreeable term sheet, which Everyrealm then incorrectly blamed on Mr. Johnson.

108.   As part of his duties, Mr. Johnson was tasked with sourcing and negotiating corporate partnerships for Everyrealm.

109.   In a meeting that occurred in Everyrealm's New York City office on or after March 7, 2020, in which Mr. Johnson and Ms. Yorio discussed potential business partners, Ms. Yorio began repeatedly referring to one potential partner as "Big Swinging Dick," or as having a "big swinging dick."

110.   Mr. Johnson was taken aback by this discussion of genital size in the workplace and thought it was inappropriate to refer to anyone, let alone potential corporate partners, with derogatory nicknames such as these.

111.   Mr. Johnson endured other inappropriate tirades by Ms. Yorio, including an episode with an external partner present. During roughly his first 10 days on the job, after March 3, 20220, Mr. Johnson had negotiated a favorable deal between Everyrealm and Cookies. Cookies is the world's leading marijuana, cannabidiol ("CBD"), and marijuana apparel company. Before a meeting with Cookies' President Parker Berling (a professional connection of Mr. Johnson's whom he had introduced to Everyrealm), Ms. Yorio agreed in principle to a deal that Mr. Johnson had negotiated. She stated, "Ok, I am fine to sign this [term sheet]. Teyo, tell your boy Parker to be nice to me and then we will make magic for him."

112.   During what was meant to be a celebratory meeting after SXSW to finalize the partnership with Cookies, and with Mr. Johnson present, Ms. Yorio repeatedly called Mr. Berling a "dick," a "fucking dick," and used the word "dick" at least nine times in response to, among other things, Mr. Berling asking who Everyrealm saw as their competition. Mr. Johnson

understood this behavior to be sexually harassing towards everyone who was present including himself.

113.    Ms. Yorio used overtly derogatory sexual language repeatedly in an aggressive manner. When Mr. Berling indicated her behavior was unwanted, and when Mr. Johnson's demeanor indicated the same, Ms. Yorio continued with her sexually harassing verbal assault.

114.    At one point, Mr. Berling stated, "I've never seen someone react so hostilely to a basic question like this. Are you ok?" The meeting ended without the parties signing the deal. Mr. Johnson estimates that Everyrealm lost over $20 million in partnership revenue because of this interaction.

115.    The next day, Ms. Yorio told Mr. Johnson, "Fix it" regarding Mr. Berling and Cookies. Mr. Johnson apologized on Ms. Yorio's behalf to Mr. Berling, but the damage was done. Mr. Berling and Cookies put the partnership with Everyrealm on hold where it remains.

116.    Soon thereafter, Defendants transferred Mr. Johnson away from Strategic Partnerships into a less desirable Asset Management role. As part of this transfer process, Defendants made Mr. Johnson hand over his entire personal rolodex to Ms. Schwartz and to the employee who replaced him. Defendants' also placed Mr. Johnson on a retaliatory 30-day performance improvement plan.

117.    Mr. Johnson was not offered severance and was not asked to sign a separation agreement when Defendants terminated him.

### III.    Mr. Johnson Experiences Race-Based Pay Discrimination at Everyrealm

118.    Defendants offered Mr. Johnson a $125,000 base salary, a discretionary $40,000 bonus, and 0% in equity. Defendant's told Mr. Johnson that this pay package was nonnegotiable

22

and he must take it or leave it. Mr. Johnson has since learned that Everyrealm regularly negotiates pay packages with its white and non-Black employees.

119.    Mr. Johnson also learned, in June 2022, that he was the lowest paid Director in Everyrealm's history.

120.    White Directors in roles substantially similar to his were paid hundreds of thousands of dollars more and were granted millions of dollars in Everyrealm and Republic equity, whereas Mr. Johnson was not.

121.    Defendants even paid a 23-year-old Strategic Partnerships Associate beneath Mr. Johnson more in base salary than they paid him for no discernible reason other than his race.

122.    Upon information and belief, Defendants Ms. Yorio and Ms. Schwartz determined Mr. Johnson's discriminatory pay package.

123.    Mr. Johnson alleges, in the alternative, that if his race was not the sole factor behind his discriminatorily low pay, the sexual harassment he experienced contributed to Defendants' decision to underpay him.

## IV.    Mr. Johnson Experiences an Adverse Employment Action after Blowing the Whistle on an Illegal Proposed Crypto Gambling Scheme

124.    During his employment with Defendants, Mr. Johnson became aware of a proposed new business vertical at Everyrealm that struck him as being clearly illegal.

125.    Defendants proposed a crypto gambling scheme that Mr. Johnson reasonably believed would violate numerous New York and Federal laws. Mr. Johnson reported this reasonable belief to Board Member Julia Schwartz, among others.

126.    The project involved a cryptocurrency version of fantasy sports in which users would buy packs of NFTs representing professional soccer playing cards. Users would enter

cryptocurrency into a pool and then win prize money if their NFT playing cards performed better than the other players' NFTs.

127.    Mr. Johnson became concerned when he learned that Ms. Schwartz and others wanted the packs of NFT playing cards to disperse randomly to the users playing in each pool. Mr. Johnson reasonably believed that by randomizing the packs of cards the project would qualify as a game of chance and thus be illegal because Everyrealm did not possess a commercial gaming license in New York. Mr. Johnson reported these concerns up Everyrealm's chain of command, and the project was eventually scrapped.

128.    Ms. Schwartz and Ms. Yorio then soured on Mr. Johnson because he raised concerns around the legality of the proposed product. Mr. Johnson was told by another Everyrealm executive that he was "in Janine's doghouse" because he raised these issues.

129.    After this occurred, Ms. Yorio and Ms. Schwartz stymied the deals that Mr. Johnson put together for Everyrealm in retaliation.

130.    For example, Mr. Johnson worked closely with Andreessen Horowitz's Cultural Leadership Fund to line up a partnership between Everyrealm and NFL.com. Significant progress was made. After some initial calls, Mr. Johnson scheduled a meeting between Everyrealm and NFL.com. Ms. Schwartz and Mr. Johnson represented Everyrealm in person at this meeting. Mr. Johnson led the meeting, and it went well. NFL.com's representative ended it by saying, "Send us a proposal and I look forward to reading It and showing it to my team."

131.    Mr. Johnson felt that Everyrealm had a leg up on the competition for its bid with NFL.com because of his background as an NFL alumnus. Mr. Johnson took the success of this potential deal seriously. It occurred to him that if he could close this deal, he would have been the first and only former NFL player working with the NFL in the metaverse.

132.    The Monday after this meeting, Mr. Johnson was working from Everyrealm's New York City office. While there, he created a project plan for the NFL.com proposal and made internal requests to have 3D graphics designed for the proposal. Ms. Schwartz asked Mr. Johnson to be "kept in the loop" and stated that she wanted to write the proposal herself. However, it became clear within a couple of days that not only had Ms. Schwartz not started writing the proposal, but she was secretly preventing anyone in her department from providing Mr. Johnson with the 3D graphics he had requested.

133.    By Wednesday of that week Mr. Johnson received an email from NFL.com asking, "Where's the proposal?"

134.    Rather than react with a sense of urgency upon receiving this email, Ms. Schwartz told Mr. Johnson, "What is the hurry?"

135.    Mr. Johnson told the NFL.com representative that he would have the proposal to him by the end of the week and got to work writing it himself. Mr. Johnson outlined ideas that Ms. Yorio had discussed with him including a token-gated skybox meeting place for fans of each NFL team.

136.    Mr. Johnson ran the proposal by Everyrealm's General Counsel William Kerr.

137.    Mr. Kerr told Mr. Johnson that "This is the first proposal the company has ever written, all Janine does is send term sheets," and gave the proposal positive feedback.

138.    Mr. Johnson still did not have the graphics he requested but he brought the proposal to Ms. Yorio regardless and told her to change or add to it as she saw fit, then sign her name and email it to the NFL.com representative. Ms. Yorio agreed to do so.

139.    Then, after a separate meeting with Ms. Schwartz at which Mr. Johnson was not present, Ms. Yorio told Mr. Johnson, "I don't know what *that* was, but we are not sending it," in

reference to his proposal, and "We don't need to be detailed in what we can build out, we need to be vague."

140.    Mr. Johnson was flummoxed. He had put together a proposal using many of the ideas that Ms. Yorio shared with him only to be told that the proposal was too detailed and no good.

141.    Mr. Johnson's proposal was never sent to the NFL.com representative. Instead, Ms. Yorio sent Everyrealm's company deck, which NFL.com's representative had already received weeks prior.

142.    After not hearing back from NFL.com, Ms. Yorio asked the NFL.com representative, "Where are we on the deal?" Everyrealm still had not received a response two weeks later. Ms. Yorio removed Mr. Johnson from the deal and placed a 23-year-old new-hire on it instead.

143.    Because of Ms. Schwartz and Ms. Yorio's retaliation, the NFL.com deal never materialized.

144.    It occurred to Mr. Johnson that it was only after Ms. Yorio and Ms. Schwartz met, which happened shortly after he reported that Ms. Schwartz's proposed crytpo gambling scheme was illegal, that Ms. Yorio and Ms. Schwartz acted to thwart this deal and used its failure as evidence for Mr. Johnson's termination.

**V.      Mr. Johnson Experiences Racism at Everyrealm**

   a.    *Ms. Yorio threatens to "trade" Mr. Johnson*

145.    Mr. Johnson was regularly demeaned, tokenized, and humiliated at work on account of his race. For example, after Mr. Johnson finished leading a successful partnership meeting with LeBron James's entertainment production company, SpringHill, Ms. Yorio—

surrounded by white colleagues—told Mr. Johnson that "[You're] lucky that went well, now I don't have to trade you . . .."

146.    Mr. Johnson sourced and negotiated this partnership deal only to have a racist comment spewed at his expense.

147.    Ms. Yorio made this same, tired racist comment numerous times. Mr. Johnson understood this comment to be an attempt to imply that Ms. Yorio owned him on account of him being a Black former professional athlete.

      *b.*     <u>*Ms. Yorio sounds a dog whistle*</u>

148.    Despite Mr. Johnson's stellar academic credentials, his qualifications and intelligence were frequently questioned and disparaged at Everyrealm due to the color of his skin.

149.    For instance, on April 23, 2022, Ms. Yorio stated that Mr. Johnson "needs to go. He is not a good representative for us. He isn't smart, he doesn't know asset management and he absolutely does not know our industry. He does not put our best foot forward."

150.    The only meaningful difference between Mr. Johnson and the other employees in external facing roles at Everyrealm is that Mr. Johnson is Black.

151.    Ms. Yorio's allegation that "[Mr. Johnson] isn't smart" is absurd on its face. *See supra* ¶¶ 33-36. Ms. Yorio would not have made this comment but for Mr. Johnson's race.

152.    Ms. Yorio's statement that "He does not put our best foot forward" was a racist reference to Defendants' belief that external partners would prefer to see a white employee across the table from them. It is no wonder that Mr. Johnson was the only Black man working at Everyrealm when he was terminated.

153.    Ms. Yorio's other justifications are also pure pretext. Nobody "knows" the digital real estate industry yet. It is nascent. This is precisely why Mr. Johnson was hired. He possessed

transferable commercial real estate skills that would help Everyrealm establish the digital real estate industry.

154.    Once Ms. Yorio decided that Mr. Johnson "needed to go," she terminated him.

c.    *Ms. Yorio refers to Mr. Johnson as "a stupid Black person"*

155.    In the presence of Everyrealm Board Member Ms. Schwartz and other employees, Ms. Yorio attempted to justify Mr. Johnson's discriminatory termination, saying, "it's worse to have a stupid Black person on the team because then you're really just exploiting them and making it look like you're trying to be diverse."

156.    Mr. Johnson is not "a stupid Black person." Ms. Yorio's comment makes clear that Everyrealm terminated Mr. Johnson because of his race.

157.    Furthermore, no reasonable person would state that a man with Mr. Johnson's readily apparent intelligence and credentials is "stupid" but for racial prejudice or animus.

d.    *Ms. Yorio calls Mr. Johnson "expensive"*

158.    Mr. Johnson facilitated a $500,000 investment into Everyrealm before the company hired him and discriminatorily paid him a $125,000 salary. Despite creating significant value for Everyrealm that exceeded his salary, Ms. Yorio repeatedly referred to Mr. Johnson as "expensive" to other Everyrealm employees.

159.    Ms. Yorio chose the word "expensive" to, again, imply that she owned Mr. Johnson.

160.    In fact, Mr. Johnson was the lowest paid Director in Everyrealm's history. Given that Mr. Johnson was the lowest paid Director at Everyrealm and he objectively created value exceeding his salary, there can be no reason why Ms. Yorio called Mr. Johnson "expensive" aside from irrelevant racial prejudice.

161. Mr. Johnson suffered severe damage to his reputation and professional relationships outside of Everyrealm because of the misconduct described herein. Mr. Johnson has also suffered from severe humiliation, chronic sleeplessness, anxiety, stress, and the physical manifestations thereof as a direct result of Defendants' cruel misconduct.

## FIRST CAUSE OF ACTION
### Discrimination in Violation of Section 1981
### (All Defendants Except Mr. Kerr)

162. Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

163. By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of his race and/or color in violation of Section 1981 by denying him the same terms and conditions of employment available to employees who are white, including, but not limited to, subjecting him to disparate working conditions and denying him terms and conditions of employment equal to that of employees who are white.

164. As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including but not limited to, loss of future income, compensation, and benefits for which he is entitled to an award of damages.

165. Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff under Section 1981 for which Plaintiff is entitled to an award of punitive damages.

166. As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, emotional distress for which he is entitled to an award of compensatory damages.

## SECOND CAUSE OF ACTION
### Violations of New York Labor Law EPL
### (All Defendants)

167.     Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

168.     The claims brought herein under the New York Labor Law § 194 are brought on behalf of Plaintiff.

169.     During the period of the employment of Plaintiff, Defendants were subject to the provisions of the New York Labor Law § 194. During the employment of Plaintiff, Defendants required Plaintiff to perform the same or substantially the same job position as white employees, requiring substantially similar skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff at a rate of pay, including salary, bonus, and equity, less than such white employees. The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a bona fide factor other than race, such as education, training, or experience.

170.     Defendants engaged in patterns, practices and/or policies of employment which willfully, and in the alternative, unwillfully, discriminated against Plaintiff by paying Plaintiff a lesser rate of pay, including salary, bonus, and equity, than that paid to white and/or non-Black employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions and at the same establishments.

171.     By the actions described above, among others, Defendants have violated the New York Labor Law.

172. As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the New York Labor Law, Plaintiff suffered, and continues to suffer, harm for which he is entitled to an award of monetary damages and other relief.

173. Plaintiff is further entitled to liquidated damages, reasonable costs, and attorneys' fees.

### THIRD CAUSE OF ACTION
**Sexual Harassment, Hostile Work Environment, and Discrimination in Violation of the NYSHRL**
**(All Defendants)**

174. Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

175. By the acts described above, Defendants discriminated against and sexually harassed Plaintiff based on his gender, race, ethnicity, and color in violation of Executive Law of New York, § 296 et seq. by subjecting Plaintiff to disparate treatment based upon his race and gender including, but not limited to, subjecting him to sexual harassment, and a hostile work environment.

176. Defendants are liable under the NYSHRL as Plaintiff's "employer."

177. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and will continue to suffer economic harm entitling him to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

178. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, emotional distress and mental anguish entitling him to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

179.     Defendants' unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL, entitling Plaintiff to an award of punitive damages.

### FOURTH CAUSE OF ACTION
**Sexual Harassment, Hostile Work Environment, and Discrimination in Violation of the NYCHRL**
**(All Defendants)**

180.     Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

181.     By the acts described above, Defendants sexually harassed and discriminated against Plaintiff based on his gender, race, ethnicity, and color in violation of the Administrative Code of the City of New York, § 8-107 et seq. by subjecting Plaintiff to disparate treatment based upon his gender and race including, but not limited to, subjecting him to sexual harassment, and a hostile work environment.

182.     Defendants are liable under the NYCHRL as Plaintiff's "employer," and because they coerced, intimidated, threatened or interfered with, or attempted to coerce, intimidate, threaten, or interfere with, Plaintiff's exercise or enjoyment of rights granted or protected under Section 8-107 of the Administrative Code of the City of New York.

183.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and will continue to suffer economic harm entitling him to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

184.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, emotional distress and

mental anguish, entitling him to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

185.    Defendants' unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL entitling Plaintiff to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### Aiding and Abetting/Inciting/Compelling/Coercing in Violation of the NYSHRL
### (All Defendants)

186.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

187.    Defendants knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, sexual harassment, and retaliation against Plaintiff in violation of the NYSHRL.

188.    As a direct and proximate result, Plaintiff suffered and continues to suffer monetary and/or economic harm, including, but not limited to, loss of past income, future income, compensation, and benefits, for which he is entitled to an award of monetary damages and other relief.

189.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, emotional distress for which he is entitled to an award of monetary damages and other relief.

190.    Defendants unlawful, discriminatory, and retaliatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### Aiding and Abetting/Inciting/Compelling/Coercing in Violation of the NYCHRL
### (All Defendants)

191.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

192.    Defendants knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, sexual harassment, and retaliation against Plaintiff in violation of the NYCHRL.

193.    As a direct and proximate result, Plaintiff suffered and continues to suffer monetary and/or economic harm, including, but not limited to, loss of past income, future income, compensation, and benefits, for which he is entitled to an award of monetary damages and other relief.

194.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, emotional distress for which he is entitled to an award of monetary damages and other relief.

195.    Defendants unlawful, discriminatory, and retaliatory actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**SEVENTH CAUSE OF ACTION**
**Whistleblower Retaliation in Violation of NYLL § 740**
**(All Defendants)**

196.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

197.    As detailed above, Defendant subjected Plaintiff to multiple adverse employment actions because Plaintiff disclosed and/or objected to an activity, policy, or practice of Defendant that is in violation of a law, rule, or regulation that creates a substantial and specific danger to the public health or safety, including, but not limited to, regulated games of chance and gambling.

198.    Defendants retaliated against Plaintiff in violation of the NYLL by adversely altering the terms and conditions of his employment by transferring him to a new department and sabotaging his work because he reported up the Everyrealm chain of command to redress, among other things, Defendants' proposed unlawful line of business.

199.    As a direct and proximate result of Defendant's willful and unlawful conduct in violation of the NYLL, Plaintiff has suffered, and continues to suffer, harm for which he is entitled to an award of damages, to the greatest extent permitted by law.

200.    The foregoing conduct of Defendants constitutes willful violations of the NYLL for which Plaintiff is entitled to an award of punitive and/or liquidated damages.

**EIGHTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**
**(All Defendants)**

201.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

202.    Defendants engaged in conduct toward Mr. Johnson that is extreme and outrageous so as to exceed the bounds of decency in a civilized society; namely by, *inter alia*, repeatedly sexually harassing him and making repeated references at work in front of others to the odious idea that Defendants own Mr. Johnson on account of his race.

203.    These actions were taken with the intent to cause, or disregard for, the substantial probability of causing severe emotional distress.

204.    As a direct and proximate result of Defendants' extreme and outrageous conduct, Mr. Johnson has suffered severe emotional distress.

205.    Defendants' conduct was wanton, malicious, willful and/or cruel, entitling Mr. Johnson to an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in an amount to be determined at trial for the following relief:

A.      a declaratory judgment that the actions, conduct, and practices of Defendants violated federal, state, and city laws;

B.      an award of economic damages;

C.      an award of compensatory damages;

D.      an award of monetary damages for mental anguish and emotional distress;

E.      an award of punitive damages;

F.      an award of such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

G.      an award of reasonable attorneys' fees, costs, and expenses of this action;

H.      permanent equitable and injunctive relief; and

I.      such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

**Dated:** October 14, 2022
New York, New York

Respectfully submitted,

/s/ Shane Seppinni

Shane Seppinni
Seppinni LLP
43 W 43rd St., Suite 256
New York, NY 10036
212-849-7000
shane@seppinnilaw.com

*Counsel for Plaintiff*