UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TEYO JOHNSON,

                                        Plaintiff,

                   -v-

EVERYREALM, INC., JULIA SCHWARTZ, JANINE
YORIO, AND WILLIAM KERR,

                                        Defendants.

---

22 Civ. 6669 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This case calls upon the Court to apply the recently enacted Ending Forced Arbitration of

Sexual Assault and Sexual Harassment Act of 2021 (the "EFAA"), Pub. L. No. 117-90, 135 Stat.

26, *codified at* 9 U.S.C. §§ 401–02, which amended the Federal Arbitration Act ("FAA"), and

which President Biden signed into law on March 3, 2022.  As pertinent here, the EFAA defines a

"sexual harassment dispute" as "a dispute relating to conduct that is alleged to constitute sexual

harassment under applicable Federal, Tribal, or State law."  9 U.S.C. § 404(4).  At the election of

a person alleging "conduct constituting a sexual harassment dispute," the EFAA makes pre-

dispute arbitration agreements unenforceable "with respect to a case which is filed under Federal,

Tribal, or State law and relates to . . . the sexual harassment dispute."  *Id.* § 402(a).

Plaintiff Teyo Johnson is a former employee of digital real estate company Everyrealm,

Inc. ("Everyrealm").  As a condition of employment, Johnson entered into an agreement with

Everyrealm containing a broad mandatory arbitration provision.  Johnson now sues Everyrealm

and several officers: Janine Yorio, Julia Schwartz, and William Kerr (collectively, "Everyrealm"

or "defendants").

The claims in Johnson's First Amended Complaint ("FAC"), Dkt. 29, include, against all defendants but Kerr: (1) race discrimination, in violation of 42 U.S.C. § 1981; and, against all defendants: (2) pay discrimination in violation of New York Labor Law ("NYLL") § 194; (3) sexual harassment, hostile work environment, and discrimination on the basis of gender, race, and ethnicity, in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 *et seq.*; (4) the same, in violation of the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-502 *et seq.*; (5) aiding and abetting the NYSHRL violations above; (6) aiding and abetting the NYCHRL violations above; (7) whistleblower retaliation in violation of NYLL § 740; and (8) common-law intentional infliction of emotional distress. *See* FAC ¶¶ 162–205.

Everyrealm has moved, under the parties' arbitration agreement, to compel arbitration of Johnson's claims. Johnson counters that, because the FAC includes sexual harassment claims, the arbitration agreement is unenforceable under the EFAA. Everyrealm counters that Johnson's sexual harassment claims are fabricated and implausibly pled; that these should be dismissed under Federal Rule of Civil Procedure 12(b)(6); and that the Court should compel arbitration of the remaining claims.

For the following reasons, the Court finds that Johnson's FAC has pled a plausible claim of sexual harassment in violation of the NYCHRL. And the Court construes the EFAA to render an arbitration clause unenforceable as to the entire case involving a viably pled sexual harassment dispute, as opposed to merely the claims in the case that pertain to the alleged sexual harassment. The Court accordingly denies, in its entirety, Everyrealm's motion to enforce the arbitration clause. Johnson's claims will now proceed in this Court.

## I.    Background[1]

### A.    Factual Background

The FAC makes many factual allegations in support of its claims. In light of the narrow issue under the EFAA that the pending motion to compel arbitration presents, the following summary is focused on the allegations germane to the FAC's claims of sexual harassment. The

---

[1] The following account of Johnson's factual allegations is drawn from the FAC. Insofar as the analysis herein requires a determination of whether the FAC states a plausible claim of sexual harassment, the Court evaluates the sufficiency of the FAC's allegations under Federal Rule of Civil Procedure 12(b)(6), accepting as true all uncontradictory factual allegations in the FAC and drawing all reasonable inferences in Johnson's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). In this analysis, the Court disregards the "contemporaneous writings" of Johnson's that defendants have filed. *See* Dkts. 17, 35–37. Defendants argue that these expose the falsity of various allegations in the FAC. *See* Dkt. 34 ("MTD Mem.") at 20. *But see* Dkt. 39 ("MTD Opp.") at 24–25 (Johnson, terming materials "disputed"). But, because analysis under Rule 12(b)(6) turns on the plausibility of the claims of sexual harassment as pled, the materials filed by defendants must be disregarded. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 113 (2d Cir. 2010) ("In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." (internal quotation marks omitted)); *Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 193 (S.D.N.Y. 2019) ("[A]ffidavits or exhibits that go beyond the Complaint may not be considered on a Rule 12(b)(6) motion" and "[t]o the extent that defendants' submissions rely on documents that raise factual challenges to the allegations of the Complaint, such arguments are not properly considered on a Rule 12(b)(6) motion").

Insofar as the Court's analysis entails evaluating a motion to compel arbitration, courts in this Circuit typically evaluate motions to compel arbitration under standards similar to those for motions for summary judgment. *See Barrows v. Brinker Restaurant Corp.*, 36 F.4th 45, 49 (2d Cir. 2022). When determining whether a dispute falls within an arbitration agreement's scope, courts consider all relevant evidence supplied by the parties and draw reasonable inferences in favor of the non-moving party. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017). Here, however, resolution of the motions does not turn on material disputes of fact regarding an arbitration agreement. The content and dates of the successive employment agreements between Johnson and Everyrealm that contain the parties' arbitration agreements are undisputed. *See* Dkt. 40-2 ("Johnson Empl. Agt."); Dkt. 64, Ex. A ("2d Johnson Empl. Agt."). And, save for conclusorily and unpersuasively labeling these agreements unconscionable, Johnson does not challenge the validity of these agreements. *See* Dkt. 13 ("MTC Opp.") at 10–19. The enforceability of the arbitration agreements turns instead on conclusions of law: how the EFAA applies to a case which, as the Court finds here, includes a plausibly stated claim of sexual harassment.

Court recounts other allegations as context and to illuminate the FAC's other claims. The Court

rejects defendants' argument that, because the factual allegations on which the FAC's sexual

harassment claims rest were generally not included in Johnson's initial Complaint, the Court

must disregard these allegations.[2]

---

[2] The allegations that the FAC alleges in support of its sexual harassment claims under the NYSHRL and NYCHRL were indeed absent from Johnson's initial Complaint. *See generally* Dkt. 1. Defendants argue that these should be disregarded because they (1) were fabricated as a ploy to bring this case within the EFAA and avoid arbitration, and (2) contradict the initial Complaint. *See* Dkt. 32 ("MTD Mem.") at 2; *see also* Dkt. 39 ("MTD Opp.") at 24–25 (opposing this argument). Such relief is unwarranted.

As to defendants' first point, the Court, as explained above, must treat the plaintiff's factual pleadings as true. After discovery, defendants will be at liberty to argue that facts alleged have been proven untrue. If such is established, defendants may seek appropriate relief.

As to defendants' second point, the factual allegations added by the FAC do not contradict the initial Complaint. "Where a plaintiff blatantly changes his statement of the facts in order to respond to the defendant's motion to dismiss and *directly contradicts* the facts set forth in his original complaint, a court is authorized to accept the facts described in the original complaint as true." *Vasquez v. Reilly*, No. 15 Civ. 9528 (KMK), 2017 WL 946306, at *3 (S.D.N.Y. Mar. 9, 2017) (emphasis added) (internal alterations, quotation marks, and citation omitted). And where an initial pleading's factual allegations preclude relief, a plaintiff may be held to them despite deleting them from a successor complaint. *See, e.g.*, *Underwood v. Coinbase Glob., Inc.*, No. 21 Civ. 8353 (PAE), 2023 U.S. Dist. LEXIS 17201, at *17–19 (S.D.N.Y. Feb. 1, 2023) (collecting cases). "Where, however, an amended pleading is not in 'direct' contradiction with the original pleading, courts apply the general rule recognizing that an amended pleading completely replaces the original pleading." *Brooks v. 1st Precinct Police Dep't*, No. 11 Civ. 6070 (MKB), 2014 WL 1875037, at *3 (E.D.N.Y. May 9, 2014). Such is the case here. The FAC does not squarely contradict any facts pled in the Complaint, including its allegations in support of its claims of sexual harassment in violation of the NYSHRL and NYCHRL. *See Frey v. Pekoske*, No. 18 Civ. 7088 (CS), 2021 WL 1565380, at *10 (S.D.N.Y. Apr. 21, 2021) (no direct contradiction where fourth complaint alleged a second off-camera search occurred, even after three earlier complaints and pleadings alleged only one search); *id.* at *10 (challenge to new allegations was "the stuff of fact-finding, not a motion to dismiss").

Defendants also wrongly characterize the addition of sexual harassment claims and supporting factual averments as impermissibly "transform[ing] the case." *Compare Morris v. City of New York*, No. 20 Civ. 9314 (GBD), 2022 WL 2866450, at *3 (S.D.N.Y. July 21, 2022) (new allegations that were similar did not transform case), *with Camacho v. City of New York*, No. 19 Civ. 11096 (DLC), 2020 WL 4014902, at *3 (S.D.N.Y. July 16, 2020) (it would transform case

### 1. The Parties

Everyrealm is a digital real estate company with a principal place of business in New York. *Id.* ¶¶ 3, 15. Yorio is Everyrealm's CEO and a member of its board of directors. *Id.* ¶ 25. Schwartz is a member of Everyrealm's board and an employee. *Id.* ¶ 26. Kerr is Everyrealm's general counsel. *Id.* ¶ 24.

Everyrealm has attracted celebrity and influencer investors. *Id.* ¶ 7. Johnson was hired to manage celebrity relationships and cultivate new celebrity, sports, and brand partnerships for Everyrealm. *Id.* ¶ 9. Before working at Everyrealm, Johnson had played football in the National Football League, and worked in private equity and commercial real estate. *Id.* ¶¶ 35–36.

Johnson, a Nevada resident, was assigned to Everyrealm's New York City office for at least two weeks per month. *Id.* ¶ 14.

### 2. Everyrealm Hires Johnson

Johnson was invited to apply for a position at Everyrealm after he helped introduce a professional contact to Yorio, which led to a $500,000 investment in Everyrealm's Series A funding round. *Id.* ¶ 40. Everyrealm interviewed Johnson and hired him as director of strategic partnerships. *Id.*

During her interview of Johnson, CEO Yorio told him, in response to an answer of his, "you're not just a pretty face," embarrassing Johnson. *Id.* ¶ 47. During the interview and

---

to add entirely new category of persons to class action). Defendants claim that Johnson "cast aside" "[t]he original 'theme' of this Action," which is that "Everyrealm terminated [Johnson] solely on account of his race," *see* MTD Mem. at 2 (citing Dkt. 1 ¶ 71)). That is incorrect. The FAC does not drop any claims in the initial Complaint, including that Johnson was terminated as a result of race discrimination. It instead adds claims of gender discrimination and sexual harassment. And, although the initial Complaint did not bring a claim of sexual harassment, it did state, albeit conclusorily, that Everyrealm chief executive officer ("CEO") Yorio had "sexually harasse[d] Johnson." *See* Compl. at 16 (heading).

Johnson's ensuing employment, Yorio made strange and unprompted statements to Johnson, including that she, Yorio, was "part Black." *Id.* ¶ 49. In July 2022, Johnson learned that Yorio had told other employees after Johnson's interview that he "is the whitest Black guy I've ever met." *Id.* ¶ 42.

On February 24, 2022, Johnson signed an employment agreement with Everyrealm in which he agreed, *inter alia*, to arbitrate "any dispute or controversy arising out of or relating to any interpretation, construction, performance, or breach of this Agreement." Johnson Empl. Agt. at 6.[3] "[E]xcited by the opportunity to join a fast-growing startup and to become the first ex-NFL player to enter the Metaverse," Johnson decided to join Everyrealm. FAC ¶ 50.

Defendants offered Johnson a non-negotiable pay package entailing a $125,000 base salary and a discretionary $40,000 bonus. *Id.* ¶ 118. Johnson later learned that he was the lowest paid director in Everyrealm's history, *id.* ¶ 119, and that white directors in roles similar to his were paid hundreds of thousands of dollars more while also being given millions of dollars in equity, *id.* ¶ 120. Defendants paid a 23-year-old strategic partnerships associate, who Johnson implies was not Black, a higher base salary than Johnson. *Id.* ¶ 121.

Everyrealm's employee handbook prohibits sexual harassment. *Id.* ¶ 52.

---

[3] The FAC does not allege the date on which Johnson was hired. But Johnson's employment agreement, which is cognizable, is dated February 24, 2022. On January 24, 2023, after the pending motions had been briefed, defendants notified the Court that they had uncovered a second employment agreement containing an arbitration provision. This one was between Johnson, Republic Realm Inc. (Everyrealm's former name), and Justworks Employment Group LLC—which, defendants state, was Everyrealm's "outsourced provider of certain human resources support." *See* Dkt. 64; FAC ¶ 10 n.6 (Republic Realm Inc. name change). In pertinent part, that agreement, dated March 2, 2022, states that "arbitration [i]s the sole and exclusive means to resolve all disputes that may arise between you and Worksite Employer [Republic Realm Inc.] and/or you and Justworks, including, but not limited to, disputes regarding termination of employment and compensation." *See* 2d Johnson Empl. Agt. at 4. The parties have not identified any differences of consequence between the February 24 and March 2, 2022 arbitration provisions.

### 3.  "Know Your Personnel" and "Know Your Client"

The FAC alleges that Johnson experienced "unrelenting harassment that was unsolicited, unwanted, and sexual in nature throughout his Everyrealm tenure." *Id.* ¶ 51.  Between March 11 and 20, 2022, Johnson attended a South by Southwest ("SXSW") conference in Austin, Texas, on a work trip also attended by CEO Yorio and other Everyrealm executives. *Id.* ¶ 53.

While at SXSW, Yorio told Johnson about a "sex-related game that she encouraged employees to play" that she alternatively called "KYP," for "Know Your Personnel," or "KYC," for "Know Your Client." *Id.*  ¶¶ 54–55.  Yorio told Johnson that both "game names were euphemisms for 'having sex' or 'hooking up' with coworkers and business partners"; she instructed Johnson that "the way to play the game was to 'get laid' by a coworker while on a business trip." *Id.* ¶¶ 56–57.  Yorio asked Johnson if he would be "doing any KYP," *id.* ¶ 58, and "insinuat[ed] that doing so was strongly encouraged," *id.* ¶ 59.  Johnson, "taken aback," responded that he was "[a]lready really close with someone." *Id.* ¶ 60.

Yorio persisted.  Later that evening, she confronted Johnson at the hotel and told him that she "'know[s]' that he is in a relationship 'right now' but that she thought he 'would cheat on [his girlfriend] if the opportunity arises.'" *Id.* ¶ 61 (alterations in original).  Johnson was "mortified and dismayed," *id.* ¶ 62, and declined to participate in KYP, *id.* ¶ 64.

After they had returned from SXSW to the New York City office, Yorio continued to ask Johnson repeatedly if he had "done" or "would do 'any KYP.'" *Id.* ¶ 65.  Johnson repeatedly told Yorio he did not want to participate. *Id.* ¶ 66.

Also in the New York City office, Yorio and Everyrealm's head of gaming, Zachary Huntgate, in Johnson's presence, loudly speculated as to other employees' "KYP game[s]" and about which employees at the company "were allowed to date each other and which were already

7

in relationships." *Id.* ¶¶ 67–70.  Yorio asked Huntgate who at Everyrealm was going to date an employee named Rachel. *Id.* ¶ 69.  Huntgate responded that Rachel was "for Tyler." *Id.*  Yorio responded, "[o]h, ok." *Id.* ¶ 70.  Johnson, the FAC alleges, felt he "could not escape the sexual harassment-filled toxic work environment" that existed "in the conversations that occurred around his desk." *Id.* ¶ 71.

### 4.  The Everyrealm Company Party

Sometime after March 21, 2022, Everyrealm hosted a company-wide party in its New York City office. *Id.* ¶ 72.  Johnson attended with his then-girlfriend, whom he brought at the encouragement of Yorio, Schwartz, and an Everyrealm cofounder. *Id.* ¶¶ 73–74.  Johnson's girlfriend suffered from severe anxiety and brought her service dog with her. *Id.* ¶ 74.

When Johnson and his girlfriend arrived at the party, Yorio and Schwartz ignored him and gave his girlfriend "dirty looks." *Id.* ¶ 75.  Johnson's girlfriend "picked up on the negative tension and dirty looks," was uncomfortable, and told him Johnson she wanted to leave minutes after arriving. *Id.* ¶ 76.

The next day, at Everyrealm's New York City office, Yorio and Schwartz repeatedly mocked Johnson's girlfriend to him and other employees. *Id.* ¶ 78.  They nicknamed Johnson's girlfriend "Dog in a Bag"—and used this moniker exclusively "[f]rom this point forward . . . in their interactions with [Johnson] and certain other Everyrealm employees" while telling Johnson they believed his girlfriend was lying about her mental illness. *Id.* ¶¶ 79–80.

That same day, also in the New York City office, Yorio told Everyrealm employees "everyone was dragging ass" from the party. *Id.* ¶ 81.  Yorio approached Johnson's desk and asked if he had arrived late to work because he "hooked up with Dog in a Bag?" *Id.* ¶ 82.  Johnson responded that he had not been late. *Id.*  Yorio asked Johnson if he "got laid" the night

before. *Id.* ¶ 83. Johnson "again told her 'No.'" *Id.* Johnson "made it abundantly clear that he was uncomfortable and did not want to continue discussing whether he and his guest had had sex the night before." *Id.* ¶ 84. Yorio persisted, repeatedly asking Johnson why he and "Dog in a Bag" did not "hook up." *Id.* ¶ 85. Johnson, who at this point was "deeply uncomfortable with [Yorio's] questions about his sex life but was concerned about not being viewed as a team player in his new job," told Yorio that his girlfriend was menstruating "so that [Yorio] would stop bothering him about his sex life and let him return to work." *Id.* ¶ 86. After this exchange, Yorio told multiple people in the New York City office that Johnson was "walking around telling people that 'Dog in the Bag is on the rag.'" *Id.* ¶ 87. Johnson "felt humiliated and angry." *Id.* ¶ 88.

### 5. Yorio and Kerr Make Inappropriate Comments in Johnson's Presence

The FAC alleges that a variety of other sex-related comments were made in Johnson's presence. Yorio habitually "referred to external partners' genitals in her interactions with [Johnson]." *Id.* ¶ 107. On or after March 7, 2022, Yorio and Johnson had a meeting in the New York City office to discuss potential business partners. *Id.* ¶ 109. There, Yorio repeatedly referred to a potential partner as "Big Swinging Dick" or as having a "big swinging dick." *Id.*

Kerr also made inappropriate comments of a sexual nature about an Everyrealm investor. On or after March 7, 2022, at the New York City office, Kerr and Johnson had a meeting to discuss Johnson's responsibilities in his new role. *Id.* ¶ 97. Kerr told Johnson that he was transitioning responsibility for managing celebrity investor relationships to Johnson and referred to an Everyrealm investor as "A Night in Paris." *Id.* ¶¶ 98–99. Johnson, confused, asked Kerr to explain the reference. *Id.* ¶ 100. Kerr stated that "A Night in Paris" is how he and others at Everyrealm referred to celebrity investor Paris Hilton—in reference to a revenge pornography

film by the same name involving her. *Id.* ¶¶ 101–04. Johnson was "horrified that in order to carry out his job duties he was made [to] listen to the derogatory commentary and sexually harassing nickname that defendants had assigned an investor whom [he] was tasked with managing." *Id.* ¶ 105.

On March 13 or 14, 2022, at SXSW, Yorio stated in front of group of employees including Johnson that she believed one of her cofounders was an "incel"—that is, an involuntary celibate—and that this cofounder was "'in love with' a 'Japanese guy'" who was also attending SXSW." *Id.* ¶ 90 & n.18. The same evening, Yorio told Johnson and other employees that "she hoped her cofounder and this person would 'have gay sex.'" *Id.* ¶ 93. Johnson feared that if he told Yorio to stop making such comments, he would be punished or terminated, particularly because he was a recent employee and, as to his knowledge, the only Black man working at Everyrealm. *Id.* ¶ 95.

### 6. The Cookies Deal

During Johnson's first 10 days on the job, including after March 3, 2022 (the effective date of the EFAA), he had negotiated a favorable deal between Everyrealm and Cookies, "the world's leading marijuana, cannabidiol, and marijuana apparel company." *Id.* ¶ 111. Before a meeting with Cookies's president Parker Berling—whom Johnson had introduced to Everyrealm—Yorio agreed in principle to the deal Johnson had negotiated. *Id.* Yorio stated: "Ok, I am fine to sign this [term sheet]. [Johnson], tell your boy Parker to be nice to me and then we will make magic for him." *Id.*

During the meeting with Berling, Yorio, in Johnson's presence, Yorio repeatedly called Berling a "dick," a "fucking dick," and used the word "dick" at least nine times, including in response to Berling's questions about Everyrealm's perceptions of their competition. *Id.* ¶ 112.

At one point, Berling responded, "I've never seen someone react so hostilely to a basic question like this. Are you okay?" *Id.* ¶ 114. The parties did not sign the deal that Johnson had negotiated. Johnson estimates that, as a result, Everyrealm lost more than $20 million in partnership revenue. *Id.* The next day, Yorio told Johnson to "[f]ix it"—that is, the deal between Everyrealm and Cookies. *Id.* ¶ 115. Johnson apologized on Yorio's behalf, but Berling and Cookies "put the partnership with Everyrealm on hold where it remains." *Id.* ¶ 117.

### 7. Yorio's Racist Comments

Johnson was also "regularly demeaned, tokenized, and humiliated at work on account of his race." *Id.* ¶ 145. Yorio repeatedly referred to Johnson as "expensive," *id.* ¶ 159, implying that she owned him, and, after Johnson had completed a successful partnership meeting with LeBron James's entertainment production company, joked about "trad[ing] [Johnson]." *Id.* ¶ 145. Yorio also said that Johnson "needs to go" because "[h]e isn't smart, he doesn't know asset management and he absolutely does not know our industry" and "does not put our best foot forward." *Id.* ¶ 149. Yorio attempted to justify his termination, in the present of Schwartz and other Everyrealm employees, saying: "[I]t's worse to have a stupid Black person on the team because then you're really just exploiting them and making it look like you're trying to be diverse." *Id.* ¶ 155.

### 8. The Crypto-Gambling Scheme and Johnson's Termination

On an unspecified date during his employment, Johnson learned of a "proposed new business vertical" at Everyrealm—a "crypto gambling scheme"—that struck him as likely illegal. *Id.* ¶¶ 124–25. The scheme involved a cryptocurrency version of fantasy sports where users would buy packs of non-fungible tokens ("NFTs") representing professional soccer players' cards, enter cryptocurrency into a pool, and win prize money if their NFT cards performed better

11

than other players' NFTs. *Id.* ¶ 126. When he learned that Schwartz and others wanted the packs of NFTs to be "disperse[d] randomly to users playing in each pool," Johnson believed the project would qualify as a game of chance and be illegal, absent a commercial New York gaming license. *Id.* ¶ 127. Johnson reported his belief to Schwartz and others. *Id.* ¶ 125. Eventually, the project was scrapped. Schwartz and Yorio "soured on [him]" after he raised his concerns, and other employees told him he was "in [Yorio's] doghouse." *Id.* ¶ 128. In retaliation, Yorio and Schwartz began to "stymie[] the deals" that Johnson generated for Everyrealm. *Id.* ¶¶ 129–33. For example, Johnson had made "[s]ignificant progress" on a partnership deal with NFL.com. *Id.* ¶ 130. Johnson organized and led a meeting with NFL.com representatives, which went well, and at which Schwartz was the other Everyrealm representative. *Id.* NFL.com's representative ended the meeting by stating, "[s]end us a proposal and I look forward to reading [i]t and showing it to my team." *Id.* Johnson felt his background as an NFL player had given Everyrealm an advantage. *Id.* ¶ 131.

The Monday after this meeting, while working from Everyrealm's New York City office, Johnson created a project plan for the NFL.com proposal and submitted internal requests for 3D graphics designs. *Id.* ¶ 132. Schwartz asked that Johnson be "kept in the loop" and stated that she wanted to write the proposal herself. *Id.* Schwartz did not write the proposal, but instead "secretly prevent[ed] anyone in her department from providing [] Johnson with the 3D graphics he had requested." *Id.* NFL.com contacted Johnson asking for the proposal. *Id.* ¶ 133. After learning of NFL.com's email, Schwartz asked: "What is the hurry?" *Id.* ¶ 134. Johnson told the NFL.com representative he would provide a proposal by the end of the week and began to write a proposal using ideas he had discussed with Yorio. *Id.* ¶ 135. After finishing a draft, Johnson

sent it to Kerr. *Id.* ¶ 136. Kerr gave positive feedback and told Johnson, "[t]his is the first proposal the company has ever written," and "all [Yorio] does is send term sheets." *Id.* ¶ 137.

Johnson brought his proposal—still missing the requested graphics—to Yorio. *Id.* ¶ 138. He asked that Yorio change the proposal as she saw fit, sign it, and email it to the NFL.com representative. *Id.* Yorio agreed to do so. *Id.* But after a separate meeting with Schwartz, at which Johnson was not present, Yorio refused to send the proposal, stating, "[w]e don't need to be detailed in what we can build out, we need to be vague." *Id.* ¶ 139. Yorio never sent the proposal. *Id.* ¶ 141. Instead, she re-sent Everyrealm's company deck, which NFL.com's representative had already received weeks earlier. *Id.*

After not hearing back from the NFL.com representative, Yorio asked about the deal's status, but had not heard a response as of two weeks later. *Id.* ¶ 142. Yorio removed Johnson from the deal and replaced him with a 23-year-old new hire. *Id.* The NFL.com deal never materialized. *Id.* ¶ 143.

At some point thereafter, defendants transferred Johnson from strategic partnerships into a less desirable asset management role. *Id.* ¶ 116. As part of his transfer, Johnson was made to give his personal rolodex to Schwartz and his replacement. *Id.* Defendants also placed Johnson on an allegedly retaliatory 30-day performance improvement plan. *Id.* Defendants ultimately terminated Johnson without severance pay or a separation agreement. *Id.* ¶ 117.

**B.    Procedural Background**

On August 5, 2022, Johnson filed the initial Complaint, which brought claims against the present defendants and nine other entities.[4]  *See* Dkt. 1.  It brought, against all defendants, (1) race discrimination claims under 42 U.S.C. § 1981; (2) pay discrimination claims in violation of NYLL § 194; (3) a discrimination claim on the basis of race, ethnicity, and color, in violation of the NYSHRL; (4) the same, in violation of the NYCHRL; (5) aiding and abetting claims with respect to the NYSHRL violations above; (6) aiding and abetting claims with respect to the NYCHRL violations above; and (7) a whistleblower retaliation claim in violation of New York Labor Law § 740; and, as to all defendants except Schwartz, (8) a common-law claim of intentional infliction of emotional distress.[5]

On August 19, 2022, defendants moved to compel arbitration on the basis of the mandatory arbitration provision in Johnson's employment agreement.  Dkt. 8.  In support, they filed a memorandum of law, Dkt. 9 ("MTC Mem."), and declarations, Dkts. 10–11.  On August 22, 2022, the Court set a briefing schedule.  Dkt. 12.  On September 9, 2022, Johnson responded, MTC Opp., and filed declarations in support, Dkts. 14–15.  On September 23, 2022, defendants replied, Dkt. 16 ("MTC Reply"), and filed a declaration in support, Dkt. 17.

On September 26, 2022, Johnson requested leave to file a surreply, Dkt. 18, and, the following day, moved for emergency relief to enjoin an arbitration against him that, Johnson stated, Everyrealm had—without notice to the Court—initiated on September 12, 2022, Dkt. 19.  In support, Johnson filed a memorandum of law and a declaration.  Dkts. 20–21.  Johnson argued

---

[4] These were: Compound Asset Management LLC, OpenDeal Inc., OpenDeal Portal LLC, Realm Metaverse Real Estate, Republic, Republic Crypto LLC, Republic Operations LLC, Republic Realm Inc., and Republic Realm Manager LLC.

[5] Johnson has recently stated that he is abandoning his claim of intentional infliction of emotional distress as to Kerr.  *See* MTD Opp. at 21–22.

that his lawsuit was subject to the EFAA, precluding enforcement of the arbitration agreement. On September 28, 2022, the Court granted Johnson's request to file a surreply. Dkt. 22. Also on September 28, 2022, defendants filed a letter objecting to Johnson's failure to confer with them before seeking emergency relief. Dkt. 23. Defendants represented that Johnson had been on notice of the arbitration brought by Everyrealm since September 1, 2022—11 days earlier than the date Johnson had represented to the Court, Dkt. 19. *See* Dkt. 23.

On September 28, 2022, the Court directed defendants to file a response to Johnson's motion for emergency relief and scheduled a hearing to address the motion and parallel developments in *Yost v. Everyrealm*, No. 22 Civ. 6549 (PAE) (S.D.N.Y. Feb. 24, 2023) (citation forthcoming), a lawsuit brought by another Everyrealm employee represented by the same counsel as Johnson as to which Everyrealm also sought to compel arbitration.[6] Dkt. 24. On October 3, 2022, defendants responded. Dkt. 25. On October 4, 2022, Johnson replied, Dkt. 26, and filed a declaration in support, Dkt. 27.

On October 6, 2022, the Court held the hearing. The Court determined that, under a provision of the EFAA, 9 U.S.C. § 402(b), it was required, at the threshold, to resolve the arbitrability of Johnson's claims. Dkt. 28. The Court ordered focused briefing on whether the EFAA applied to Johnson's claims and, if so, with what effect. To assure that Johnson's basis for claiming to have brought a sexual harassment dispute within the EFAA was fully developed in advance of the parties' briefing, the Court authorized Johnson to file an amended complaint

---

[6] This case and *Yost* were not filed as related. They were, coincidentally, both assigned to this Court.

that would fully set out the factual basis for his allegations of sexual harassment. *Id.*[7] The Court also directed defense counsel to notify the American Arbitration Association that no further forward progress was to be made in the arbitral proceeding initiated by Everyrealm, unless and until the Court had held that such arbitration could proceed consistent with the EFAA, and that Johnson did not have a duty to appear or participate in the arbitration while defendants' motion to compel was pending before this Court. *Id.*

On October 14, 2022, Johnson filed the FAC. It adds claims under the NYSHRL and the NYCHRL of sexual harassment and gender discrimination. On November 2, 2022, defendants moved to dismiss the sexual harassment claims, Dkt. 33, and filed a supporting memorandum, *see* MTD Mem., and declarations, Dkts. 35–38. On November 16, 2022, Johnson filed a memorandum in opposition, *see* MTD Opp., and a supporting declaration, Dkt. 40.

On November 17, 2022, defendants moved to join Kerr to the pending motion to compel arbitration. Dkt. 43. On November 18, 2022, the Court granted that request, and ordered Johnson to make any arguments specific to Kerr in a short letter response. Dkt. 44.[8]

On November 22, 2022, nonparty Public Justice requested leave to file an amicus brief addressing issues relating to the EFAA on behalf of itself, the American Association for Justice, the National Women's Law Center, the National Employment Lawyers Association, Rape, Abuse & Incest National Network ("RAINN"), Rise, and Lift Our Voices (collectively, "amici").

---

[7] The Court clarified that—after it resolved the motion to compel arbitration—Johnson would have the opportunity to move to amend his complaint as to all other claims, and defendants would have an opportunity to oppose that motion and/or move to dismiss under Rule 12(b). *Id.*

[8] On November 21, 2022, Johnson notified the Court of his voluntary dismissal of the nine entity defendants listed above. Dkt. 45; *see supra* note 4. On November 22, 2022, the Court approved the voluntary dismissal. Dkt. 48.

Dkt. 46. The same day, the Court granted that motion. Dkt. 47. On November 23, 2022, Johnson responded by letter to defendants' argument that Kerr is covered by his arbitration provision. Dkt. 49. On November 29, 2022, in a letter, defendants requested leave to file a reply to Johnson's letter. Dkt. 51. On November 30, 2022, the Court ordered that it would treat defendants' letter as their reply. Dkt. 52.

On December 7, 2022, amici filed their brief. Dkt. 54 ("Amici Br."). On December 16, 2022, defendants replied. Dkt. 58 ("MTD Reply").

On January 18, 2023, Johnson moved to amend his complaint to add federal claims pursuant to Title VII, 42 U.S.C. §§ 2000-e *et seq.*, after receiving a Notice of Right to Sue from the Equal Employment Opportunity Commission ("EEOC"). Dkts. 60–62; Dkt. 62-3. On January 23, 2023, the Court permitted the filing of the SAC so as to preserve Johnson's Title VII claims as timely. However, the Court stated, it was not then inviting motions directed to the adequacy of the Title VII pleadings. Rather, the Court stated, it would set a briefing schedule for any motions to dismiss after—and depending upon—its resolution of the pending motion to compel arbitration and Johnson's opposition to that motion. Dkt. 63.

On February 14, 2023, Everyrealm moved for sanctions, Dkts. 66–67, which the Court denied the next day as premature, Dkt. 69. On February 15, 2023, Johnson filed the Second Amended Complaint ("SAC"). Dkt. 68.

## II. Arbitrability of Johnson's Claims

### A. The Impact of the EFAA on the Arbitration Agreement

The FAA, 9 U.S.C. §§ 1 *et seq.*, "creates a body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quotation marks omitted).

The FAA was enacted to reverse "centuries of judicial hostility to arbitration agreements" and "to place arbitration agreements upon the same footing as other contracts." *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 510–11 (1974) (internal quotation marks omitted).

Were it not for the EFAA, all claims pursued by Johnson here would be required to be resolved in arbitration. In his employment agreement, Johnson "agree[d] that any dispute or controversy arising out of or relating to any interpretation, construction, performance, or breach of this Agreement, shall be settled by arbitration to be held in the State of New York, in accordance with the rules then in effect of the American Arbitration Association." Johnson Empl. Agt. at 5 (§ 13(e)(i)).[9]  The claims that the FAC brings here—whether under Title VII, the NYSHRL, the NYCHRL, the NYLL, or common law; whether against Everyrealm or its officers Schwartz, Yorio and Kerr; and whether alleging pay disparities, discrimination or harassment based on gender, race, or other protected classifications, retaliation, or intentional infliction of emotional distress—all arise out of, at a minimum, "performance" by Johnson and Everyrealm under the employment agreement. Although Johnson makes passing attempts to avoid the arbitration agreement—claiming that it does not textually apply to his claims and terming it "unconscionable," *see* MTC Opp. at 10–19—these do not gain any traction. Johnson's claims here, which challenge his employer's treatment of him during and in connection with his employment, all come within the broad wording of the arbitration provision. And Johnson does not articulate any facts that would come close to making his employment agreement or its arbitration provision procedurally and substantively unconscionable. *See Ragone v. Atl. Video at*

---

[9] The arbitration clause exempts only the right of the Company—defined as Everyrealm, Inc.—to pursue injunctive relief in a court of competent jurisdiction. *See* Dkt. 40-2 at 6 (§ 13(e)(ii)). That provision is irrelevant here.

*Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) (New York law requires procedural and

substantive unconscionability); *see, e.g., Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 58

(E.D.N.Y. 2017) (fee-splitting provision not unconscionable where plaintiff did not make

particularized showing of inability to pay for arbitration or showing of cost differential so

substantial so as to deter claims); *see also Valle v. ATM Nat., LLC*, No. 14 Civ. 7993 (KBF),

2015 WL 413449, at *6 (S.D.N.Y. Jan. 30, 2015) (holding fee-shifting provision within

agreement substantively unconscionable as applied, because enforcement would bankrupt

plaintiff; court severed this provision, and compelled arbitration).[10]

> The EFAA, however, amends the FAA.  It provides:

> Notwithstanding any other provision of this title, at the election of the person
> alleging conduct constituting a sexual harassment dispute or sexual assault dispute,
> or the named representative of a class or in a collective action alleging such
> conduct, no predispute arbitration agreement or predispute joint-action waiver shall
> be valid or enforceable with respect to a case which is filed under Federal, Tribal,
> or State law and relates to the sexual assault dispute or the sexual harassment
> dispute.

9 U.S.C. § 402(a).  The EFAA defines a "sexual harassment dispute" as "a dispute relating to

conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State

law." 9 U.S.C. § 401(4).  The EFAA further provides that its application "shall be determined by

a court, rather than an arbitrator," under federal law, "irrespective of whether the party resisting

---

[10] Johnson's claims equally clearly are within the scope of the second employment agreement's
arbitration provision, in which he agreed to arbitration as "the sole and exclusive means to
resolve *all* disputes that may arise between [Johnson] and [Everyrealm] and/or [Johnson] and
Justworks, including, *but not limited to*, disputes regarding termination of employment and
compensation." 2d Johnson Empl. Agt. at 3 (emphasis added); *id.* ("[A]ny claim, dispute, and/or
controversy that you may have against Worksite Employer [Everyrealm] (or its owners,
directors, officers [)] . . . shall be submitted to and determined exclusively by binding arbitration
under the Federal Arbitration Act.").  Unlike the first agreement, the arbitration provision in the
second agreement does not provide for the sharing between the parties of arbitral costs. *Id.*

arbitration challenges the arbitration agreement specifically or in conjunction with other terms of
the contract containing the agreement," or "whether the agreement purports to delegate such
determinations to an arbitrator."[11] 9 U.S.C. § 402(b); *Walters v. Starbucks Corp.*, No. 22 Civ.
1907 (DLC), 2022 WL 3684901, at *2 (S.D.N.Y. Aug. 25, 2022).

 The EFAA applies only to claims that accrued on or after March 3, 2022, the day
President Biden signed the EFAA into law; it does not have retroactive effect. *See* Pub. L. No.
117-90, § 3, 136 Stat. 26, 28 (2022); *see, e.g.*, *Walters*, 2022 WL 3684901, at *3; *Zinsky v.
Russin*, No. 22 Civ. 0547 (MJH), 2022 WL 2906371, at *3–4 (W.D. Pa. July 22,
2022); *Newcombe-Dierl v. Amgen*, No. 22 Civ. 2155 (DMG), 2022 WL 3012211, at *5 (C.D.
Cal. May 26, 2022). The limited case authority to date under the EFAA, all from district courts,
has solely concerned whether it applies retroactively and whether the claims at issue in those
cases accrued after March 3, 2022. *See, e.g.*, *Marshall v. Hum. Servs. of Se. Texas, Inc.*, No. 21
Civ. 529 (MAC), 2023 WL 1818214, at *3 (E.D. Tex. Feb. 7, 2023) (EFAA not retroactive;
affirming arbitration award related to claims that accrued before March 3, 2022; *Zuluaga v.
Altice USA*, No. A-2265-21, 2022 WL 17256726, at *5 (N.J. Super. Ct. App. Div. Nov. 29,
2022) (per curiam) (compelling arbitration of claims that accrued before March 3, 2022);
*Woodruff v. Dollar Gen. Corp.*, No. 21 Civ. 1705 (GBW), 2022 WL 17752359, at *3–4 (D. Del.
Dec. 19, 2022) (same); *Steinberg v. Capgemini Am., Inc.*, No. 22 Civ. 489 (JRS), 2022 WL
3371323, at *2 (E.D. Pa. Aug. 16, 2022) (same); *Walters*, 2022 WL 3684901, at *3 (same);
*Newcombe-Dierl,* 2022 WL 3012211, at *5; *see also Zinsky*, 2022 WL 2906371, at *3–4
(compelling arbitration as to parties to arbitration agreement, but not as to nonparties); *Bushey v.*

---

[11] The parties agree, consistent with the statutory text, that the EFAA empowers the Court to
decide the arbitrability in the first instance. Dkt. 60 ("Hearing Tr.") at 32, 40, 51.

*Home Direct Logistics, LLC*, No. UWY-CV-21-6061586 S, 2022 WL 2298419, at *4 n.4 (Conn. Super. Ct. June 24, 2022) (citing 9 U.S.C. § 402 in passing as example of recent "chinks in the armor" of national policy favoring arbitration); *cf. Pepe v. N.Y. Life Ins. Co.*, No. 22 Civ. 4005 (SSV), 2023 WL 1814879, at *4 n.19 (E.D. La. Feb. 7, 2023) (holding EFAA not to apply where complaint's factual allegations and two references to "harassment" did not describe sexual harassment).

In light of the above, defendants' motion to compel arbitration presents, in sequence, two issues. The first is whether the FAC "alleges conduct constituting a sexual harassment dispute," so as to come within the EFAA.[12] The second is whether, if so, the EFAA makes the arbitration agreement unenforceable as to the entirety of the FAC's claims, or only as to its claims of sexual harassment.

### B.    Whether the FAC Plausibly Pleads a Sexual Harassment Claim Under the NYCHRL—and Thereby Contains a Claim Within the EFAA's Scope

The parties and amici dispute the showing that must be made for a complaint to implicate the EFAA. Defendants argue that, for the EFAA to apply, a complaint must plausibly allege a claim of sexual harassment—that is, the claim must be pled sufficient to sustain a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See* MTD Mem. at 3–17; MTD Reply at 3–13. Johnson, without arguing whether a lesser showing would suffice, argues that the FAC pleads plausible sexual harassment claims. *See* MTD Opp. at 13–21. Johnson's amici, more ambitiously, argue that, provided that it is not sanctionably frivolous, even a claim of sexual

---

[12] The EFAA equally applies to "sexual assault dispute[s]." Because Johnson's case does not include such claims, the ensuing discussion, including as to the EFAA's construction, is framed solely in terms of "sexual harassment dispute[s]."

harassment that has not been plausibly pled implicates the EFAA and precludes enforcement of an arbitration agreement. *See* Amici Br. at 5–8.

For the reasons that follow, the Court finds that the claim in Johnson's FAC of sexual harassment in violation of the NYCHRL has been plausibly pled. As a result, measured against the most demanding showing that could be—or that has been—advocated, the FAC implicates the EFAA. Accordingly, the Court does not have occasion in this case to resolve whether the EFAA can be implicated by a lesser pleading—that is, a complaint that attempts, but fails, to plausibly plead a claim of sexual harassment. That issue, however, is raised by, and resolved in the decision today in, the companion case of *Yost v. Everyrealm, Inc., et al.*, No. 22 Civ. 6549 (PAE) (S.D.N.Y. Feb. 24, 2023) (citation forthcoming).[13]

In evaluating the plausibility of the FAC's sexual harassment claims, the Court applies familiar standards. To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to

---

[13] The statutory term "sexual harassment dispute" includes not only claims of sexual harassment, but also disputes "relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law." *See* 9 U.S.C. § 401(4). An example would be a lawsuit bringing a claim against an employer for retaliating against a plaintiff who had reported sexual harassment. *See* Amici Br. at 9. This case does not contain any claims of this nature. The Court thus does not have occasion to consider the standards by which a court would assess whether such a claim, as pled, implicates the EFAA.

dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145. That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

### 1. Standards for Pleading Sexual Harassment Under the NYCHRL

Although the FAC brings sexual harassment claims under the NYSHRL and the NYCHRL, the Court's focus here is on the NYCHRL claim. That is because the NYCHRL's standards of liability are lower than, or equal to, those of the NYSHRL.

Historically, the NYCHRL was more lenient than the NYSHRL, whose standards until recently had been keyed to the more demanding standards of Title VII, which, as pertinent here, requires to establish a hostile work environment, "severe and pervasive" conduct. *See Williams v. N.Y.C. Hous. Auth., et al.*, No. 21-1527, slip op. at 24–25 (2d Cir. Feb. 23, 2023); *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 65–66 (S.D.N.Y. 2020). An amendment to the NYSHRL, effective October 11, 2019, has put in place a more lenient standard of liability that has been likened to that of the NYCHRL. *See Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP*, No. 21 Civ. 02512 (CM), 2022 WL 524551, at *9 (S.D.N.Y. Feb. 22, 2022) (amendment removed "severe and pervasive" requirement). The amended NYSHRL applies to the claims in this case, which postdate the effective date of the amendment. *See id.*; *cf. Wellner v. Montefiore Med. Ctr.*, No. 17 Civ. 3479 (KPF), 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019) (amendments do not apply to conduct predating effective date). The amended NYSHRL, like the NYCHRL, is to be construed "liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws including those laws

with provisions worded comparably to the provisions of [the NYSHRL] have been so

construed." *McHenry*, 510 F. Supp. 3d at 68 (alteration in original) (citing N.Y. Exec. Law.

§ 300). The case law, however, has not definitively resolved whether the effect of the 2019

amendment is to make the NYSHRL's standard *identical* to that of the NYCHRL—or merely

closer to it. *Compare Syeed v. Bloomberg L.P.*, No. 20 Civ. 7464 (GHW), 2022 WL 3447987, at

*6 (S.D.N.Y. Aug. 17, 2022) ("[A]fter that amendment, the standard for NYSHRL aligns with

the NYCHRL standard for claims that accrued on or after October 11, 2019."), *with Wellner*,

2019 WL 4081898, at *5 n.4 (amendment brings the NYSHRL "closer to" the NYCHRL

standard). Therefore, the Court here applies the NYCHRL, because the NYCHRL supplies

the—or ties with the NYSHRL for the—most lenient applicable liability standard.[14]

---

[14] The EFAA applies to "conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law." Although the term "State law" is undefined, the Court reads that term to encompass local (for example, municipal) laws barring sexual harassment such as the NYCHRL. The EFAA does not contains any indication that Congress, by this formulation, intended to exclude such laws. And, where Congress has defined "state" elsewhere, it has done so broadly as including states' subdivisions. *See, e.g.*, Armed Forces Act of 1959, 10 U.S.C. § 2232(1) (1983); Consumer Credit Protection Act, 15 U.S.C. §§ 1692a(8), § 1693a(10) (1982); Natural Gas Policy Act of 1978, 15 U.S.C. § 3316(b)(2)(C)(i) (1982), *repealed by* Pub. L. 101-60, § 2(b), 103 Stat. 158 (July 26, 1989); Organized Crime Control ("RICO") Act of 1970, 18 U.S.C. § 1961(2) (1984); Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1144(c)(1)–(2) (1975) ("State law" includes all "laws . . . or other State action," and "State," in turn, includes "a State any political subdivisions thereof"); Act of August 31, 1954, Pub. L. No. 83–738, 30 U.S.C. § 552(18) (1971); Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601(2) (1983); Powerplant and Industrial Fuel Act of 1978, 42 U.S.C. § 8441(e)(4) (1983); Communications Act of 1934, *as amended*, 47 U.S.C. § 224(a)(3) (Supp. 1985); Cable Communications Policy Act of 1984, 47 U.S.C. § 522(15) (Supp. 1985); Motor Carrier Safety Act of 1984, 49 U.S.C. § 2503(10) (Supp. 1985); *cf.* Intergovernmental Cooperation Act of 1970, 42 U.S.C. § 4762(3) (1983) (specifying "State" excludes political subdivisions); *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 608 (1991) (in context of the Federal Insecticide, Fungicide & Rodenticide Act, the "exclusion of political subdivisions cannot be inferred from the express authorization to the 'State[s]' because political subdivisions are components of the very entities the statute empowers" (alterations in original)); *United Bldg. & Const. Trades Council of Camden Cnty. & Vicinity v. Mayor & Council of City of Camden*, 465 U.S. 208, 215 (1984) (local ordinance has to comport with the Privileges and

This Court has recently reviewed the NYCHRL's standards for sexual harassment, contrasting them to those of Title VII or the pre-amendment NYSHRL. *See McHenry*, 510 F. Supp. 3d at 65–66; *see also Cano v. SEIU Loc. 32BJ*, No. 19 Civ. 8810 (PAE) (KHP), 2021 WL 4480274, at *11 (S.D.N.Y. Sept. 30, 2021). To state a sexual harassment claim under the NYCHRL, a plaintiff need only simply allege facts showing that she "was subject to 'unwanted gender-based conduct.'" *McHenry*, 510 F. Supp. 3d at 66 (quoting *Erasmus v. Deutsche Bank Ams. Holding Corp.*, No. 15 Civ. 1398 (PAE), 2015 WL 7736554, at *7 (S.D.N.Y. Nov. 30, 2015)). Ultimately, a plaintiff "need only demonstrate 'by a preponderance of the evidence that she has been treated less well than other employees because of her gender.'" *Id.* (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013)); *see also Williams*, slip op. at 25 ("[T]he plaintiff need only show that her employer treated her 'less well than other employees,' at least in part for a discriminatory reason." (citation omitted)). Those standards reflect that courts must "construe [the NYCHRL] broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Caravantes v. 53rd St. Partners, LLC*, No. 09 Civ. 7821 (RPP), 2012 WL 3631276, at *13 (S.D.N.Y. Aug. 23, 2012) (alterations omitted) (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 477–78 (N.Y. 2011)).

---

Immunities Clause because "a municipality is merely a political subdivision of the State from which its authority derives").

Reading the EFAA to encompass local laws is also consistent with the statute's broad stated purposes—to "prohibit the enforcement of mandatory, pre-dispute arbitration . . . provisions in cases involving sexual assault or sexual harassment," H.R. Rep. No. 117-234, at 3 (2022), "restore access to justice for millions of victims of sexual assault or harassment who are currently locked out of the court system," *id.* at 4, and allow "others [to] learn[] of widespread misconduct," *id.* at 5. Interpreting the EFAA as reaching local laws aligns with Congress's judgment that sexual assault and harassment cases belong, as a category, in courts—and not in "secretive" arbitration proceedings that "often favor[] the company over the individual." *Id.* at 4. Defendants have not argued for the contrary result.

At the same time, "district courts must be mindful that the NYCHRL is not a general civility code," *McHenry*, 510 F. Supp. 3d at 66 (quoting *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 79 (1st Dep't 2009)), and does not apply to conduct that "a reasonable victim of discrimination would consider petty slights and trivial inconveniences," *Williams*, slip op. at 26 (citation omitted).

### 2. Does the FAC Plead Conduct Constituting Sexual Harassment Under the NYCHRL?

Defendants first argue that the FAC does not plausibly allege conduct exceeding "petty slights or trivial inconveniences," MTD Mem. at 8–13, or that any harassment was "because of" a discriminatory motive, *id.* at 6–8.

Those arguments are unpersuasive. The pertinent standard is whether the plaintiff was subject to "unwanted gender-based conduct." The FAC so pleads. As reviewed above, the FAC alleges that Yorio repeatedly pressured Johnson to participate in "KYP" or "KYC"—that is, to have sex with colleagues, including herself, or with clients—despite Johnson's having repeatedly asked her to stop. *See* FAC ¶¶ 54–71. Yorio's conduct as alleged is easily construed "to reflect sexual advances and propositions, albeit . . . crude and clumsy ones, towards [Johnson]." *McHenry*, 510 F. Supp. 3d at 70–71 (sustaining NYCHRL claim where defendant sent plaintiff sexually explicit text messages and doctored photos making it appear that she had sent him a suggestive photo); *see, e.g., Mihalik*, 715 F.3d at 114–15 (reinstating NYCHRL claim where supervisor's "sexually-charged conduct," including two sexual propositions, "subjected [plaintiff] to a different set of employment conditions than her male colleagues); *Kassapian v. City of New York*, 155 A.D.3d 851, 853 (2017) (sustaining NYCHRL claim where defendant repeatedly demonstrated sex toy to plaintiff); *Kaplan v. N.Y.C. Dep't of Health & Mental Hygiene*, 142 A.D.3d 1050, 1051 (2016) (sustaining NYCHRL claim based on a single instance

26

of supervisor rubbing his hand over his groin and inner thigh while making "grunting noises of a sexual nature" at a training session with plaintiff and another female employee); *Nunez v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 14 Civ. 6647 (JMF), 2015 WL 4605684, at \*11 (S.D.N.Y. July 31, 2015) (sustaining NYCHRL claim where supervisor repeatedly invited plaintiff to go to movies or plays with him, said he was "infatuated" with plaintiff, and said that if she did not go on dates with him he would make her "perform the unnecessary and time-consuming task" of transferring her contacts to a new, state-issued Blackberry mobile-phone), *aff'd sub nom. Nunez v. Lima*, 762 F. App'x 65 (2d Cir. 2019); *cf. Bray v. N.Y.C. Dep't of Educ.*, 59 Misc. 3d 1222(A), at \*6 (N.Y. Sup. Ct. 2018) (unreported) (sustaining, at summary judgment, NYCHRL claim where plaintiff raised triable issue whether alleged workplace conduct included "some form of sexual solicitation").

Yorio's conduct, as alleged, is all the more clearly actionable under the NYCHRL because, as alleged, she propositioned or goaded Johnson towards engaging in workplace sexual conduct multiple times within a short period, soon after his hire, in her capacities as CEO and Johnson's immediate supervisor, and while making other sexualized comments. *See, e.g.*, FAC ¶¶ 62–68, 109; *see Hernandez v. Kaisman*, 957 N.Y.S.2d 53, 59 (2012) ("Viewed independently, defendant's dissemination of emails containing mildly offensive sexual media content may not have been enough to rise to the level of hostile work environment under the City HRL," but they were when viewed in "the overall context" of other demeaning or embarrassing comments.); *cf. Williams*, slip op. at 23 (considering totality of circumstances in assessing hostile work environment claim); *Mihalik*, 715 F.3d at 111 (same). Important, too, as pled, Yorio's conduct of this nature also extended past the EFAA's effective date of March 3, 2022. *See, e.g.*, FAC ¶¶ 53–88.

Defendants attempt to minimize these allegations by labeling the conduct alleged in the FAC mere "petty slights or minor annoyances." MTD Mem. at 5. For multiple reasons, that argument fails. Most important, as measured by the case law above, Yorio's alleged conduct exceeds the governing standard of unwanted gender-based conduct. In addition, the case law recognizing that the NYCHRL does not apply to "petty slights or minor annoyances," although not unitary on this doctrinal point, generally identifies that as an affirmative defense ill-suited to a motion to dismiss. *See, e.g.*, *Sanderson v. Leg Apparel LLC*, No. 19 Civ. 8423 (GHW), 2020 WL 7342742, at *8 (S.D.N.Y. Dec. 14, 2020) (denying motion to dismiss); *Kassapian*, 155 A.D.3d at 853 (same); *Kaplan*, 142 A.D.3d 1051 (same); *see also N.Y.C. Hous. Auth.*, 61 A.D.3d at 80. And the cases dismissing claims which defendants cite on this point, *see* MTD Mem. at 9–10, are readily distinguished.[15]

The FAC also adequately alleges that Yorio's sexualized conduct coaxing Johnson to engage in sexual activity with colleagues including her was "because of" his gender. At the pleading stage, a complaint's allegations "need only allege facts that give plausible support to the notion that [the plaintiff] has been treated less well because of his gender." *See Garcia v. N.Y.C.*

---

[15] These include cases that alleged only "stray remarks using nominally gendered or racial language," *Goodwine v. City of New York*, No. 15 Civ. 2868 (JMF), 2016 WL 3017398, at *8–9 (S.D.N.Y. May 23, 2016) (supervisor referred to plaintiff "as a 'cunt' and 'bitch'" and "was once asked rhetorically if she was 'smoking crack'"); or generalized comments untargeted to a particular person, *see Inman v. v. City of New York*, No. 08 Civ. 8239 (DAB), 2011 WL 4344015, at *7 (S.D.N.Y. Sept. 13, 2011) (plaintiff, along with others, called "loads," as in "loads of shit," and "lazy"); *Kim v. Goldberg, Weprin, Finkel, Goldstein, LLP*, 120 A.D.3d 18, 23 (1st Dep't 2014) (granting dismissal, or in the alternative summary judgment, where partner at law firm made inappropriate comments regarding plaintiff's breast feeding because "a reasonable person would consider the complained-of conduct nothing more than petty slights and trivial inconveniences"). *But see Bermudez v. City of New York*, 783 F. Supp. 2d 560, 567–68, 588 (S.D.N.Y. 2011) (denying summary judgment against NYCHRL claim where supervisor made inappropriate sexual comments, commented on plaintiff's physical appearance, and called plaintiff to express his feelings for her).

*Health & Hosps. Corp.*, No. 15 Civ. 2119 (DAB), 2016 WL 4097850, at *7 (S.D.N.Y. July 26, 2016) (denying motion to dismiss sexual harassment claim under NYCHRL) (internal quotation marks and citations omitted). And in cases such as this alleging "explicit or implicit sexual proposals" by a woman to a man or vice-versa, "there is a presumption that the conduct occurred because of gender differences." *Nachmany v. FXCM, Inc.*, No. 16 Civ. 225 (DAB), 2020 WL 178413, at *5 (S.D.N.Y. Jan. 9, 2020).[16]

Here, as alleged, Yorio not only repeatedly encouraged Johnson to engage in sexual conduct with work colleagues, but also seemingly propositioned him herself. *See, e.g.*, FAC ¶¶ 58–59, 63, 65 (repeatedly pressuring Johnson to engage in KYP); *id.* ¶ 62 ("testing the waters" with Johnson). And she pressured Johnson for sex while repeatedly invoking his heterosexual relationship with a woman. *See, e.g.*, *id.* ¶¶ 61 (confronting Johnson at their hotel and telling him she believed he would "cheat on his girlfriend if the opportunity arises"), 75–76 (giving Johnson's girlfriend "dirty looks" at office party), 82–86 (asking Johnson if he had sex with his girlfriend the night before and repeatedly asking why not). On the facts alleged, Yorio's

---

[16] For this reason, the dismissal of the sexual harassment claims in *Nachmany* is inapposite. *See* 2020 WL 178413, at *5; MTD Mem. at 7. *Nachmany* involved allegations of same-sex harassment; in dismissing for failure to allege discrimination "because of sex," *Nachmany* distinguished opposite-sex harassment claims. *See* 2020 WL 178413, at *5 ("Normally, to show sex discrimination occurred in male-female or female-male harassment cases, plaintiffs may take advantage of certain inferences which are not available to plaintiffs in a same-sex case." (citation omitted)); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity," and "[t]he same chain of inference would be available to a plaintiff alleging same-sex harassment, if there were credible evidence that the harasser was homosexual.").

ploys and proposal for heterosexual sex with Johnson implicate her and Johnson's gender difference. *See Nachmany*, 2020 WL 178413, at *5.[17]

### 3. Does the FAC Allege a Sufficient Nexus to New York City?

Defendants separately argue that if the FAC alleges sexual harassment in violation of the NYCHRL, it does not allege a sufficient nexus to New York City. *See* MTD Mem. at 13–17; MTD Opp. at 4–13 (arguing the contrary). That argument is easily put aside.

The NYCHRL's protections extend "to non-residents who work in [New York] city." *Pedroza v. Ralph Lauren Corp.*, No. 19 Civ. 8639 (ER), 2020 WL 4273988, at *2 (S.D.N.Y. July 24, 2020). To state a claim under the NYCHRL, a "non-resident plaintiff must allege that the discriminatory conduct had an impact in New York City." *Id.*; *accord Hoffman v. Parade Publ'ns*, 15 N.Y.3d 285, 291 (2010) (plaintiff must "plead and prove that the alleged discriminatory conduct had an impact in New York"). This "impact" requirement serves to make the NYCHRL "simple for courts to apply and litigants to follow." *Pedroza*, 2020 WL 4273988, at *2 (citation omitted).

---

[17] Noting that the FAC alleges that Yorio gossiped about relationships among employees at the company, *see, e.g.*, FAC ¶ 68, defendants liken the case to one in which Title VII and NYSHRL claims centered on workplace rumors were dismissed. *See* MTD Mem. at 7 (citing *Olaechea v. City of New York*, No. 17 Civ. 4797 (RA), 2019 WL 4805846, at *6 (S.D.N.Y. Sept. 30, 2019) (dismissing Title VII and NYSHRL claims because "[r]umors of two colleagues having a sexual relationship with one another are not innately gender based—they may be equally upsetting to either colleague regardless of their gender")). That argument mischaracterizes the allegations in the FAC, which go well beyond spreading rumors. As pled, CEO Yorio repeatedly raised the prospect of sexual relations with Johnson and "test[ed] [the] waters" with him with respect to having sex with her and engaging in workplace KYP, *id.* ¶¶ 55–66. She also allegedly asked pointed questions about whether Johnson had "got[ten] laid," *id.* ¶¶ 82–87, and his relationship with his girlfriend, *id.* ¶ 61, while telling him she believed he "would cheat . . . if the opportunity arises," *id.* ¶¶ 82–87. These allegations describe conduct exceeding generalized gossip about intra-office romances.

To determine the location of the discriminatory acts, a court is to look at the location(s) where the conduct had an impact, which may not necessarily be the place in which it occurred; the impact must have been felt by the plaintiff in New York City. *See Vangas v. Montefiore Med. Ctr.*, 823 F.3d 174, 183 (2d Cir. 2016); *Pedroza*, 2020 WL 4273988, at *2. In other words, "it is the site of impact, not the place of origination, that determines where discriminatory acts occur." *Amaya v. Ballyshear LLC*, 340 F. Supp. 3d 215, 221 (E.D.N.Y. 2018) (citation omitted).

Here, as alleged, the bulk of Yorio's sexual harassment of Johnson occurred in New York City, where Johnson was assigned to work two weeks a month. FAC ¶ 14. Although Yorio first pressed Johnson to engage in KYP while at the SXSW conference in Texas, *id.* ¶¶ 53–61, her importuning of Johnson to engage in sex with her and/or Everyrealm colleagues continued in the company's New York City office. There, Yorio repeatedly pressured Johnson to engage in KYP, *id.* ¶ 65, and interviewed Johnson as to whether and/or when he had last had sex, *id.* ¶¶ 82–87.

This case, involving face-to-face harassment in New York City between the alleged harasser and a plaintiff who had ongoing part-time work responsibilities in the City, is thus a very far cry from those dismissing NYCHRL claims where out-of-state plaintiffs remotely interacted with third parties or defendants based in New York City. *See, e.g., Vangas*, 823 F.3d at 182–83 (no impact in New York City where out-of-state plaintiff's connection to City was "tangential" and consisted of speaking telephonically with New York City–based patients, who were impacted by her termination only after she ceased to work with them); *Meilus v. Rest. Opportunities Ctr. United, Inc.*, No. 21 Civ. 02554 (CM), 2021 WL 4868557, at *10–11 (S.D.N.Y. Oct. 15, 2021) ("frequent communication" with New York City–based colleagues insufficient; although plaintiff traveled to New York for work, she did not allege that any incident occurred in New York City); *Lambui v. Collins*, No. 14 Civ. 6457 (JS) (AYS), 2015 WL

5821589, at *5 (E.D.N.Y. Sept. 30, 2015) (no impact in New York City where "most" alleged conduct occurred elsewhere); *Amaya*, 340 F. Supp. 3d at 221–23 (insufficient impact in New York City where plaintiff never worked in New York City but attended isolated meetings in City office and communicated with supervisors located in City).

To the extent defendants contend that it is categorically "clear" that a plaintiff may not bring a claim under the NYCHRL "when the plaintiff did not work in New York," MTD Mem. 15–16, that statement is wrong as a matter of law and irrelevant as a matter of fact. The law is more nuanced. As the Second Circuit recently summarized, "the impact requirement . . . turn[s] primarily on the plaintiff's physical location at the time of the alleged discriminatory acts." *Syeed v. Bloomberg L.P.*, 58 F.4th 64, 69 (2d Cir. Jan. 23, 2023) (internal quotation marks and alterations omitted). But, the Circuit noted, various state and federal district courts have posited that a plaintiff can also allege impact "if he or she can show that the discriminatory acts affected the terms, conditions, or extent of his or her employment within the boundaries of New York." *Id.* (cleaned up). Recognizing the uncertain law in the area, the Circuit in *Syeed* certified to the New York Court of Appeals whether a nonresident plaintiff could satisfy the impact requirement when her only asserted geographical connection to New York was that she had been denied a New York City–based position. This debate, however, is beside the point here, given the FAC's repeated factual allegations of harassing conduct by Yorio towards Johnson in New York City, where he was assigned to work two weeks a month. *See, e.g., Kraiem v. JonesTrading Institutional Servs. LLC.*, 492 F. Supp. 3d 184, 199–200 (S.D.N.Y. 2020) (sustaining NYCHRL claims by a non-New York resident who lived in London based on

conduct during business trip to New York City). The FAC thus clearly pleads the requisite

nexus to New York City.[18]

Because the FAC plausibly pleads a claim of sexual harassment under the NYCHRL, the

EFAA applies to the instant case. *See* 9 U.S.C. § 402(a).

### C.     Whether the Arbitration Clause Is Unenforceable as to the FAC's Sexual Harassment Claims Only—Or as to the Entire Case

The parties dispute whether, after a court, as here, has determined that the EFAA applies

to a sexual harassment claim, the arbitration agreement is enforceable as to the other claims in

the case. Defendants argue that the EFAA blocks arbitration of only the sexual harassment

claim. MTC Mem. at 12–15. Johnson and his amici argue that EFAA blocks arbitration as to

the entire case. *See* MTC Opp. at 6–10; MTD Reply at 18–20; Amici Br. at 13–18. On this

question, which is one of statutory construction, Johnson is correct.

Under the FAA, "if a dispute presents multiple claims, some arbitrable and some not, the

former must be sent to arbitration even if this will lead to piecemeal litigation." *KPMG LLP v.

Cocchi*, 565 U.S. 18, 19 (2011). But the FAA's mandates in support of its "liberal federal policy

favoring arbitration agreements" may be "overridden by a contrary congressional command."

*CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (citation omitted). In *CompuCredit*,

the Supreme Court held that the Credit Repair Organizations Act does not contain a contrary

such command. The question here is whether the EFAA, which applies "[n]otwithstanding any

---

[18] Although language in *Hoffman* can be read to suggest a residency requirement, the Second Circuit has noted that *Hoffman* (1) "allow[ed] for the possibility that a plaintiff could satisfy the impact requirement without living or working in New York City or State at the time of the discriminatory acts"; and (2) relied on since-repealed statutory language. *Syeed*, 2023 WL 350565, at *2–3 & n.3 (declining to read *Hoffman*'s references to "those who work in" New York City or State to preclude claims by those who *would* work in New York City or State).

other provision of [the FAA's] title," 9 U.S.C. § 402(a), does, such that the presence of a well-pled sexual harassment claim makes an arbitration clause unenforceable as to the other claims in the case.

When resolving a dispute over a statute's meaning, the Court "begin[s] with the statutory text, exhausting all the textual and structural clues bearing on its meaning and construing each word in its context and in light of the terms surrounding it." *United States v. Bedi*, 15 F.4th 222, 226 (2d Cir. 2021) (internal quotation marks and citations omitted). Where the text is plain and unambiguous, the Court's inquiry ends there. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004); *United States v. Gayle*, 342 F.3d 89, 92 (2d Cir. 2003). "Plain meaning draws on 'the specific context in which that language is used.'" *Williams v. MTA Bus Co.*, 44 F.4th 115, 127 (2d Cir. 2022) (citation omitted). However, "[i]f upon examination [the Court] find[s] the text to be ambiguous, [it] look[s] to traditional canons of statutory construction for guidance in resolving the ambiguity." *Id.*

In its operative language, the EFAA makes a pre-dispute arbitration agreement invalid and unenforceable "with respect to a *case* which is filed under Federal, Tribal, or State law and relates to the . . . sexual harassment dispute." 9 U.S.C. § 402(a) (emphasis added). This text is clear, unambiguous, and decisive as to the issue here. It keys the scope of the invalidation of the arbitration clause to the entire "case" relating to the sexual harassment dispute. It thus does not limit the invalidation to the claim or claims in which that dispute plays a part.

The term "case" is familiar in the law. Dictionaries define a "case" as "a suit or action in law or equity," *Case*, Merriam Webster, https://www.merriam-webster.com/dictionary/case (last visited Feb. 20, 2023), or "a civil or criminal proceeding, action, suit, or controversy at law or in equity," Black's Law Dictionary (11th ed. 2019); *see United States v. Santos*, 553 U.S. 507, 511

(2008) (using dictionaries in statutory construction). "[C]ase" thus captures the legal proceeding as an undivided whole. It is does not differentiate among causes of action within it. The term "case" stands in contrast to the terms "claim" and "cause of action." A "claim" is "a right to something," *Claim*, Merriam Webster, https://www.merriam-webster.com/dictionary/claim (last visited Jan. 28, 2023), or "the assertion of an existing right; any right to payment or to an equitable remedy," Black's Law Dictionary (11th ed. 2019). A "cause of action" is "the grounds (such as violation of a right) that entitle a plaintiff to bring a suit," *Cause of Action*, Merriam Webster, https://www.merriam-webster.com/dictionary/cause%20of%20action (last visited Feb 20, 2023), "a group of operative facts giving rise to one or more bases for suing," or "a factual situation that entitles one person to obtain a remedy in court from another person," Black's Law Dictionary (11th ed. 2019). Case law is, unsurprisingly, in accord. It underscores that a "case" or "action" refers to an overall legal proceeding filed in a court, whereas a "claim" or a "cause of action" refers to a specific assertable or asserted right within such a proceeding. *See Brownback v. King*, 141 S. Ct. 740, 751 (2021) (Sotomayor, J., concurring) ("An 'action' refers to the whole of the lawsuit. Individual demands for relief within a lawsuit, by contrast, are 'claims.'" (internal citations omitted)); *Higazy v. Templeton*, 505 F.3d 161, 171–72 (2d Cir. 2007) (using "case" as a general term for an action in court); *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Hebrew Homes Health Network, Inc.*, No. 17 Civ. 01215 (TNM), 2019 WL 4346325, at *10 (D.D.C. Sept. 12, 2019) (contrasting "action," which is "the claims on which a given action is based," and "claim," which is "the means by which a person can obtain a privilege, possession, or enjoyment of a right or thing; cause of action"); *La. Crisis Assistance Ctr. v. Marzano-Lesnevich*, 878 F. Supp. 2d 662, 667 (E.D. La. 2012) (distinguishing "cause of action" and "claim" from "lawsuit" or "case").

With the ordinary meaning of "case" in mind, the text of § 402(a) makes clear that its invalidation of an arbitration agreement extends to the entirety of the case relating to the sexual harassment dispute, not merely the discrete claims in that case that themselves either allege such harassment or relate to a sexual harassment dispute (for example, a claim of unlawful retaliation for a report of sexual harassment). If further confirmation of that understanding were needed, a surrounding EFAA provision—the one that sets the EFAA's effective date—uses the narrower term "claim." As enacted in the Statutes at Large, the EFAA provides that "the amendments made by [it], shall apply with respect to any dispute *or claim* that arises or accrues on or after Mar. 3, 2022." *See* Pub. L. No. 117-90, § 3, 136 Stat. 26, 28 (2022) (emphasis added).[19] Congress, in enacting the EFAA, thus can be presumed to have been sensitive to the distinct meanings of the terms "case" and "claim." "When Congress includes particular language in one

---

[19] It is of no moment that this provision was later codified as a statutory note, as opposed to a statutory subsection, by the Office of Law Revision Counsel. The provision is congressionally enacted text. *See Conyers v. Merit Sys. Prot. Bd.*, 388 F.3d 1380, 1382 n.2. (Fed. Cir. 2004) ("Statutes at Large provide the evidence of the laws of the United States."), *cert. denied*, 543 U.S. 1171 (2005); 1 U.S.C. § 112; *see also Midland Power Co-op. v. Fed. Energy Regul. Comm'n*, 774 F.3d 1, 3 (D.C. Cir. 2014) (where statutes at large and code conflict, the former prevails). As the Federal Circuit recently explained, in refuting an argument that the "Effective Date" section of an act lacked substantive effect because of its placement in a statutory note:

> [I]t is well-established that the placement of a provision in the United States Code as a note is not dispositive. "Though the appearance of a provision in the current edition of the United States Code is 'prima facie' evidence that the provision has the force of law, . . . it is the Statutes at Large that provides the 'legal evidence of laws' . . . ."

*Cameron v. McDonough*, 1 F.4th 992, 995 (Fed. Cir. 2021) (quoting *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 507 U.S. 439, 448 (1993)); *see Nat'l Veterans Legal Servs. Program v. United States*, 968 F.3d 1340, 1343 n.1 (Fed. Cir. 2020) (that text appears as a statutory note, rather than as section text, is "of no moment"). "Indeed, even if a provision is omitted entirely from the Code, it 'remains on the books if the Statutes at Large so dictates.'" *Cameron*, 1 F.4th at 995 (quoting *U.S. Nat'l Bank of Or.*, 507 U.S. at 448).

section of a statute but omits it in another, th[e] Court presumes that Congress intended a difference in meaning." *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 777 (2018) (internal alterations omitted).  Courts presume "that Congress intended the words in a statute to carry weight." *Williams*, 44 F.4th at 128; *see Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595, 602 (2d Cir. 2021) ("[T]he canon against surplusage . . . advises courts to interpret a statute to effectuate all its provisions, so that no art will be inoperative or superfluous." (internal quotation marks omitted)); *see also King v. Burwell*, 576 U.S. 473, 504 (2015) (Scalia, J., dissenting) (Congress "knew how to equate two different types of Exchanges when it wanted to do so" and it is "telling[]" that it had not.).  The reading of the EFAA that lends coherence to the use of these separate terms assigns distinct meanings to "case" and "claim," with the former referring to the entirety of the lawsuit in which claim(s) implicating a sexual harassment dispute are brought.

In construing § 402(a), it is significant, too, that the EFAA amended the FAA directly (rather than, for example, amending a separate statute, such as Title VII, to bar the arbitration of certain claims arising under it).  That reinforces Congress's intent to override—in the sexual harassment context—the FAA's background principle that, in cases involving both arbitrable and non-arbitrable claims, "the former must be sent to arbitration even if this will lead to piecemeal litigation." *KPMG*, 565 U.S. at 19.[20]  "The plain meaning of a statutory provision may be 'understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute.'" *See Williams*, 44 F.4th at 129 (quoting *Catskill Mountains*

---

[20] In adding the EFAA, Congress also amended chapters of the FAA to state that these applied "to the extent that [they were] not in conflict with [the EFAA]." *See* 9 U.S.C. § 208, *as amended by*, Pub. L. 117-90 § 2(b)(1)(B), 136 Stat. 27 (agreements under Convention on the Recognition and Enforcement of Foreign Arbitral Awards); 9 U.S.C. § 307, *as amended by*, Pub. L. 117-90 § 2(b)(1)(C), 136 Stat. 27 (agreements under Inter-American Convention on International Commercial Arbitration).

*Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency*, 846 F.3d 492, 513 (2d Cir. 2017)); *cf.*

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) ("When Congress amends one statutory

provision but not another, it is presumed to have acted intentionally.") (comparing amendment of

Title VII with absence of amendment of ADEA).

In this respect, the EFAA, which applies to all arbitration agreements covered by the

FAA, contrasts with statutory provisions more selectively invalidating arbitration agreements.

An example is the Sarbanes-Oxley Act. Its non-arbitration provision, added by the Dodd-Frank

Wall Street Reform and Consumer Protection Act of 2010, provided that "[n]o predispute

arbitration agreement shall be valid or enforceable, if the agreement requires arbitration of a

dispute *arising under this section.*" 18 U.S.C. § 1514A(e)(2) (emphasis added). Notably, the

scope of the Dodd-Frank legislation adding non-arbitration provisions was textually cabined. As

the Second Circuit construed Dodd-Frank, it "amended several statutory provisions [including

Sarbanes-Oxley] to include anti-arbitration provisions but did not do so with respect to its own

whistleblower provision." *Daly v. Citigroup Inc.*, 939 F.3d 415, 423 (2d Cir. 2019), *cert. denied*,

140 S. Ct. 1117 (2020). As the Second Circuit analyzed: "Congress's failure to attach an anti-

arbitration provision to the Dodd-Frank whistleblower provision, while simultaneously amending

similar statutory regimes to include the same, is a strong indication of its intent not to preclude

Dodd-Frank whistleblower claims from arbitration." *Id.* (citation omitted).

The statutory text of the EFAA makes the corollary true here. Congress's choice to

amend the FAA directly with text broadly blocking enforcement of an arbitration clause with

respect to an entire "case" "relating to" a sexual harassment dispute reflects its rejection—in this

context—of the FAA norm of allowing individual claims in a lawsuit to be parceled out to arbitrators or courts depending on each claim's arbitrability.[21]

Accordingly, the Court holds that, where a claim in a case alleges "conduct constituting a sexual harassment dispute" as defined, the EFAA, at the election of the party making such an allegation, makes pre-dispute arbitration agreements unenforceable with respect to the entire case relating to that dispute.[22]

### D.   Application to the FAC and Next Steps

The Court has found the FAC to state a claim for sexual harassment in violation of the NYCHRL and therefore to entail a "sexual harassment dispute."  And the Court has construed the EFAA to block the enforcement of an arbitration provision with respect to the entirety of a

---

[21] For this reason, two cases on which defendants rely are plainly inapposite, as each involved a different statute—and differently worded arbitration-blocking provision—from the EFAA.  *See Kim v. Reins Int'l Cal., Inc.*, 9 Cal. 5th 73, 82 (2020) (involving California's Private Attorneys General Act); *Endersen v. Banc of Cal., Inc.*, No. 18 Civ. 899 (CJC), 2018 WL 11399501 (C.D. Cal. Sept. 20, 2018) (involving Sarbanes-Oxley Act); MTC Mem. at 14.

[22] In their arguments as to the EFAA's construction, defendants and plaintiff's amici have pointed to statements by members of Congress as ostensibly supporting their constructions of the statutes.  *See, e.g.*, Amici Br. at 13–14; MTD Reply at 18–19.  Because the EFAA's text supplies a clear answer to the questions at issue here, the Court does not have any charter to consider legislative history of this nature.  *See United States v. Peterson*, 394 F.3d 98, 105 (2d Cir. 2005) (even where a statute is ambiguous, a court is to apply traditional canons of statutory construction to resolve the ambiguity before looking to legislative history); *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017) ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history.").  To the extent any legislative history is utile here, it is as to the statute's purpose.  The House Judiciary Committee's Report identifies the EFAA's purpose in broad terms: to prohibit "forced arbitration" in "cases involving sexual assault or harassment" because "the arbitration system lacks transparency and precedential guidance of the justice system" and is "shielded from public scrutiny," and "there is no guarantee that the relevant law will be applied to these disputes or that fundamental notions of fairness and equity will be upheld in the process."  H.R. Rep. No. 117-234, at 3 (2022); *see Disabled in Action of Metro. N.Y. v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000) ("We focus on the most authoritative and reliable materials of legislative history, including: conference committee report, committee reports, sponsor/floor manager statement and floor and hearing colloquy.").

39

"case filed under Federal, Tribal, or State law that relates to … the sexual harassment dispute." 9 U.S.C. § 402(a). It follows that defendants' motion to compel arbitration must be denied with respect to all claims in the FAC—this entire case.[23]

Litigation will now proceed in this Court, as follows. The operative Complaint in this case is Johnson's SAC, which he sought leave to file on January 18, 2023, *see* Dkts. 60–62, as to which the Court granted such leave on January 23, 2023, *see* Dkt. 63, and which Johnson filed on February 15, 2023, *see* Dkt. 68. The SAC solely adds claims under Title VII, as to which Johnson's right to sue, pursuant to a notice from the EEOC, would, according to Johnson, have expired on January 19, 2023. *See* Dkt. 63. The Court understands defendants to intend to move to dismiss the SAC. Any such motion to dismiss is due on Friday, March 10, 2023. Johnson's opposition is due Friday, March 24, 2023. Defendants' reply is due Friday, March 31, 2023. In the event that defendants elect not to move to dismiss the SAC, defendants' answer is due Friday, March 10, 2023.[24] Also by March 10, 2023, counsel jointly are to file a proposed case management plan, consistent with the Court's Individual Rules, which provides for the prompt commencement of discovery.

---

[23] The Court does not have occasion here to consider the circumstances under which claim(s) far afield might be found to have been improperly joined with a claim within the EFAA so as to enable them to elude a binding arbitration agreement. Johnson's claims against Everyrealm and its executives all arise from his employment at Everyrealm and are clearly properly joined in a common lawsuit.

[24] While the instant motion to compel arbitration was pending, defendants, without leave of the Court, filed a motion for Rule 11 sanctions against Johnson and his counsel, Seppinni LLP, for, purportedly, fabricating factual allegations and bringing frivolous claims. *See* Dkts. 66–67. The Court, *sua sponte*, denied this motion as premature, pending resolution of the motion to compel arbitration. *See* Dkt. 68. With the motion to compel arbitration having been denied, defendants are now at liberty to bring a Rule 11 motion. The Court does not set a timetable for any such motion. The Court expects that in considering whether to bring such a motion, defendants will take account of the analysis in this decision, which is inconsistent with, *inter alia*, defendants' thesis that Johnson's sexual harassment claim under the NYCHRL was legally frivolous.

## CONCLUSION

For the foregoing reasons, the Court denies defendants' motions to compel arbitration. The Clerk of Court is respectfully directed to terminate the motions at docket numbers 8 and 33.

The schedule for next steps in this case, including defendants' answer or motion to dismiss, is as set forth herein.

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: February 24, 2023
      New York, New York